613 So.2d 817 (1992)
Roberta Alexander TYSON, a/k/a Marjorie Harriett Tyson
v.
D. Rook MOORE, III.
No. 89-CA-0241.
Supreme Court of Mississippi.
October 22, 1992.
As Modified on Denial of Rehearing March 11, 1993.
*819 T.H. Freeland, IV, T.H. Freeland, III, Tim F. Wilson, Hale Freeland, Freeland Freeland & Wilson, Oxford, for appellant.
John B. Farese, Farese Farese & Farese, Ashland, D. Rook Moore, III, Holly Springs, for appellee.
Before DAN M. LEE, P.J., and PRATHER and SULLIVAN, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION
This suit involves a dispute over the terms of a contingency fee contract between attorney, D. Rook Moore III, (Moore) and his client, Marjorie Harriett Tyson (Harriett). Moore filed the suit against Harriett seeking to recover his contingency fee under an employment contract. Harriett asserted defenses of malpractice and fraud. The Marshall County Chancery Court awarded Moore the amount of the contract  $188,841.50. Harriett appealed. This Court affirms in part, reverses and renders in part, and reverses and remands in part.

A. Facts

1.
In 1951, Robert Alexander Tyson married his third wife, Ruth McSweyn. At the time of this marriage, Robert had a seven-year-old daughter named Marjorie Harriett.[1] In 1953, Robert executed a will providing in part:
Well knowing that my beloved wife will adequately care for my daughter Harriett Tyson and make provisions for her, by this expression not creating any trust, charge, or other restraint, I give devise and bequest to my beloved wife, Ruth McSweyn Tyson all of my property of every nature and whereever [sic] situated, to her own use for ever in fee simple.
Ruth McSweyn Tyson simultaneously executed a will devising and bequeathing "all property which was devised and bequeathed to me by my beloved husband Robert A. Tyson to the daughter of the said Robert A. Tyson... . Harriett[,] to her own use forever in fee simple." Before executing both wills, Ruth orally promised to bequeath all the remaining property she received from Robert's estate to Harriett. Attorneys, Glenn Fant and J.F. Daniels, witnessed this oral promise. Robert and Ruth then executed the wills.
Robert died in 1953 and, pursuant to his will, Ruth received his entire estate. As time progressed, Ruth and Harriett became estranged. In 1965, Ruth revoked her 1953 will and executed a new will through which she placed Robert's property in trust. The will stipulated that Harriett would receive one-half of the income from the trust for life, and Ruth's sister, if living, would receive the other half. Upon Harriett's death, the trust would terminate and the corpus of the trust would vest in Ruth's sister or, if deceased, Ruth's descendants.
In 1973, Harriett's attorney wrote to Ruth seeking assurance of Ruth's intention to adhere to the oral promise to Robert that she made in 1953 to bequeath all remaining property to Harriett. Ruth responded in writing that the will of Harriett's father did not create a trust, but that she would leave "what I have of it at the time of my death to you."
Ruth died in 1983. Upon learning of the terms of the 1965 will, Harriett employed a long-time acquaintance and classmate, D. Rook Moore III, for advice. Moore has his law office in Holly Springs, Mississippi. After months of negotiation, they agreed upon the fee arrangement.
Harriett wrote to Moore, in pertinent part:
[O]ur agreement regarding your fee is that you will get 25% of ... whatever I receive of my late father's estate, whether real or personal as set forth below, if we prevail... .
... .

*820 Should we not prevail in my attaining some or all of my deceased father's estate, over and above 1/2 of the income thereof as set forth in the January, 1983, will of Ruth M. Tyson, I will owe you nothing.
This agreement or contract is the subject of this appeal.

2.
At Harriett's behest, Moore filed suit (hereinafter "first suit") in the Marshall County Chancery Court  seeking to impress a constructive trust on portions of Robert's estate which were titled in Ruth's name at her death.[2] On February 18, 1985, the chancellor impressed a constructive trust in favor of Harriett on the remainder of Ruth's property received from Robert Tyson. Executors of Ruth's estate did not appeal this chancellor's decision. The judgment became final.
Rather than appeal the chancellor's decision, the executors of Ruth's estate filed a new complaint (hereinafter "second suit") on April 5, 1985  seeking to renounce Robert's 1953 will. The executors joined both Harriett and Robert's estate as defendants. A dispute then arose between Harriett and Moore regarding his duty under the original contingent-fee contract to represent and protect her interests in this second suit in which the chancellor ultimately granted summary judgment in favor of Robert's estate.

3.
Ruth's estate appealed the chancellor's decision in the second suit, and this Court ultimately affirmed, Shattuck v. Tyson, 508 So.2d 1077 (Miss. 1987). Meanwhile, Moore and Harriett's relationship became strained as they began to collect assets of the constructive trust. On April 9, 1985, Moore wrote Orma R. Smith, Jr., of Corinth, Mississippi, attorney for Ruth's estate, and requested the immediate delivery of one-fourth of the "Bank of Holly Springs" stock, $20,000 in 1984 farm rent, and $6,300 in 1984 bank stock dividends. Moore admitted that he did not inform Harriett of his request. Harriett never saw the stock dividend check, never endorsed it, and never gave Moore permission to endorse it. The executors did not deliver the farm rent money Moore requested because Harriett did not agree to Smith's deduction of Harriett's share of expenses for taxes, utility bills, and insurance.
On April 23, 1985, Moore wrote to Harriett in New York:
I just received a check from Kathryn E. Smallwood in the sum of $6,300.00, representing payment of the 1984 Bank of Holly Springs stock dividend.
Accordingly, I am enclosing to you my Trust Account check in the sum of $4,725.00, which reflects retention of my one-fourth contingency fee.
Also, Sammy's [Orma Smith's] cover letter with the stock dividend check said that the Bank of Holly Springs stock would be returned to the bank and the 630 shares would be re-issued to you, actually on a three-fourths basis to you and a one-fourth basis to me.
Harriett testified that she expressed disapproval of Moore's actions; Moore denied that she expressed such disapproval. Harriett thought Moore was being casual with his language when he spoke of being entitled to one-fourth of all constructive trust assets. She resisted asserting this issue further because she was desperate for cash and acknowledged that Moore had received no fee to date. She decided not to contest his unilateral decision to retain one-fourth of the dividend check against that which she would eventually owe him.
On April 29, 1985, Moore wrote a letter to the bank (where he was an officer) and requested re-issuance of the bank stock:
As attorney for Marjorie Harriett Tyson, please be informed that the 630 shares awarded to her by the Court should be issued as follows:
473 shares to Marjorie Harriett Tyson
157 shares to D. Rook Moore, III
*821 Moore admitted that he did not ask for Harriett's permission; he contended that he had previously informed her that he would make such a division. On May 2, 1985, Moore forwarded to Harriett a stock certificate for 473 shares of "Bank of Holly Springs" stock.
In July 1985, Harriett offered to pay Moore one-fourth of her receipts from her estate if he would pay one-fourth of the expenses of managing the estate. He did, she testified, contribute approximately $600 to payment of taxes.
On October 11, 1985, Harriett reminded Moore to seek a hearing from the chancellor in order to obtain money still owed her by the executors of Ruth's estate for the 1984 farm rent. Harriett had received part of an estate, but little cash with which to manage it. Moore acknowledged that Harriett had no money, except what she could borrow against her assets.
On November 5, 1985, Moore wrote a letter to Harriett's farm tenant:
As you know, I represent Harriett Tyson with reference to the Ruth M. Tyson Estate.
Although litigation is not finalized, the lands leased by you from the estate are now owned by Harriett Tyson and myself.
Accordingly, please make your 1985 rental check in the sum of $3,000.00 payable to Harriett and myself.
Similarly, Moore wrote to another tenant  instructing him to pay the $17,000 payment of 1985 rent to Moore and Harriett. Moore claimed that his purpose was to ensure that the tenants paid the rent to Harriett and not the executors of Ruth's estate.
Harriett testified that, upon learning of Moore's letters to her tenants, she realized for the first time that Moore wanted one-fourth of her entire estate. On November 7, 1985, Harriett wrote Moore a letter strongly objecting to his assertion of an ownership interest in her land and reminded him that he was not due a fee until the final conclusion of litigation. Moore characterized this incident as the first major disagreement between Harriett and him. Harriett challenged Moore's construction of his employment contract. However, Moore denied that Harriett ever questioned his right to twenty-five percent of the total trust assets, but admitted that he never specifically told Harriett that he construed the contract to include a percentage of her life estate from Ruth.
Further, Harriett testified that "Moore told me essentially that if I did not pay him ... the part of the 1985 rent, and I didn't pay him a quarter of it, that it would be hard for him to consider undertaking the litigation in [the second suit]." Harriett testified that she attempted, but Moore refused, to discuss their differences. Harriett told Moore that he was not yet entitled to be paid and that his pay in any event would not be one-fourth of the entire estate.
In January 1986, Moore prevented Harriett from obtaining a Bank of Holly Springs loan against her assets. Harriett described the incident as a heated confrontation in the bank lobby, during which time Moore threatened Harriett with a lis pendens notice against her realty. Moore denied that he threatened her.
Harriett sought the advice of her friend, Sidney Hurdle, about easing tensions with Moore. Hurdle, an attorney, contacted Moore, who provided Hurdle with three documents which he gave to Harriett.[3] One document stipulated that Moore would continue to represent her in the first and second suits and, in return, Harriett would not encumber, partition, or sell any of her land. Another document  a special warranty deed awaiting her signature  granted Moore a one-fourth undivided interest in her land. The third document  a bill of sale  granted him a one-fourth interest in the personal property in her father's antebellum home. Moore explained that he had proposed that Harriett give him an undivided one-fourth interest in her property and the contents of her home in order to secure his fee, since she was seeking loans against them.
*822 After Moore asked for an undivided one-fourth interest, Harriett sought the assistance of Egbert Jones, a real estate appraiser. According to Harriett, she proposed the property division in order to escape the necessity of the undivided interest as "Moore was saying that I had to pay him in land...." On February 18, 1986, Jones provided Harriett with an appraisal, which included the statement: "With full knowledge that the indebtedness is 25% of the value of the property, land and house, and inventory, I propose two divisions of the land to make a choice of one parcel to pay indebtedness." Harriett claimed that the language was Jones', and that she did not intend for the letter to be considered as an offer. Jones recalled Harriett as saying that she didn't "have the money and that she wanted to pay [Moore] in land." Jones took the appraisal to Moore, who did not respond.
Harriett became aggrieved over Moore's lack of progress on the composition of the reply brief in the appeal in the second suit. Harriett testified that, whenever she inquired about his progress, Moore was either absent or not forthcoming with the requested information. At most, Moore would simply tell her: "Don't worry, it's being taken care of." Moore testified that he had, unknown to Harriett, obtained an extension of time within which to file his appeal brief until March 27.
Harriett testified that she was desperate for cash and frustrated with Moore's performance. She consulted with various attorneys, including T.H. Freeland, III, of Oxford, about her dilemma. Harriett testified that Moore "had become considerably prejudiced by his own self-interest." Thus, she asked Freeland to discharge Moore the next day  when the matter of the farm rentals was scheduled for a hearing.
Harriett and Freeland visited with Moore on the morning of February 25 and discharged him. Harriett then refused to pay Moore in land and offered to pay him in cash. Later that day, the chancellor issued a decree vesting ownership of the lands in Harriett during pendency of the appeal of the second suit. The chancellor instructed Harriett that she might later have to account. The chancellor also found that Harriett was due 1984 farm rent of $6,790.31.
The next day, on February 26, Moore wrote to Freeland, purporting to accept a proposal by Harriett to satisfy Moore's fee by giving him land. Freeland responded by explaining that the appraisal did not constitute an offer; Moore acknowledged that the appraisal did not bear Harriett's signature.
In March 1986, Moore wrote to Orma Smith and claimed an interest in the settled 1984 rent dispute and asked that the check be issued jointly to Harriett and him; Orma Smith complied and mailed the check to Moore.

4.
In June 1986, Moore filed a suit against Harriett  seeking to recover his contingency fee under the employment contract and $500,000 in punitive damages. Moore imposed a lis pendens on Harriett's lands in Marshall County, Mississippi. Harriett had counterclaimed against Moore charging (1) malpractice for Moore's failure to secure other assets in the constructive trust; (2) fraudulent conduct; and, (3) breach of fiduciary duties of an attorney to his client that voided his contract. Harriett sought compensatory and punitive damages.
In April 1987, the chancellor ordered: (1) expungement of Moore's lis pendens, and (2) payment to Harriett of income from rentals and timber sales. The chancellor also enjoined Harriett from removing or selling any more timber during pendency of the second suit. The chancellor allowed a lien in favor of Moore on some of Harriett's property.
In May 1987, this Court affirmed the chancellor's summary judgment in the second suit.[4] This Court's decision removed the impediment to conclusion of Moore's *823 suit against Harriett. In July 1988, the chancellor held a hearing on Moore's suit. In December, the chancellor issued his findings of fact and conclusions of law. The chancellor found that the contract clearly and unambiguously meant that Moore would receive twenty-five percent of "whatever he gained for the defendant over and above what she would have gotten had she not prevailed... ." The chancellor further found that Moore did not violate any of his duties or responsibilities as an attorney and dismissed the cross bill in its entirety. The chancellor awarded Moore $188,841.50 as Moore's contingency fee and refused to award punitive damages.

B. Issues
Harriett appealed and presented numerous issues for disposition.

II. ANALYSIS
Before embarking on an analysis of the issues, a review of the law pertaining to an attorney's duties to his clients is in order. An attorney must deal with the client in a manner of "utmost honesty, good faith, fairness, integrity, and fidelity... ." 7A C.J.S. Attorney & Client § 234 (1980). One respected treatise states:
The breach of fiduciary obligations, sometimes characterized as "constructive" fraud, has been appropriately recognized as an action in tort, not contract. The tort constitutes a wrong which is distinct and independent from professional negligence but still [comprises] legal malpractice. Some courts have suggested the standard of care encompasses the fiduciary obligations. More correctly, other courts have referred to fiduciary obligations as setting a standard of "conduct," as distinguished from the standard of "care" which pertains to the requisite skills and knowledge.
Mallen & Smith, Legal Malpractice § 11.1 (3d ed. 1989) (citations omitted). We have recently recognized this distinction between the duty of care and the duty of loyalty. Singleton v. Stegall, 580 So.2d 1242 (Miss. 1991).
The duty of loyalty is fiduciary in nature. In the present context its breach may take one of two forms. The first involves situations in which the attorney obtains an unfair personal advantage, such as acquiring property from a client; the second involves situations in which the attorney or other clients have interests adverse to the client in question. We have recently defined the lawyer's duty of loyalty to include a duty to:
safeguard the client's confidences and property, avoid conflicting interests that might impair the representation, and not employ adversely to the client powers conferred by the client-lawyer relationship.
Singleton v. Stegall, 580 So.2d at 1245. He is obliged as well to "comply with any valid contract with the client." Singleton v. Stegall, 580 So.2d at 1245. Breach of the duty may be actionable.
Breach of the duty of loyalty is a species of malpractice. Hartford Accident & Indemnity Co. v. Foster, 528 So.2d 255, 284 (Miss. 1988). The breach is characterized as "constructive fraud" because proof of intent is irrelevant; thus, the elements of actual fraud, duress, or coercion do not enter into the analysis. Gwin v. Fountain, 159 Miss. 619, 645-46, 126 So. 18, 22 (1930) (attorney's moral turpitude not an indispensable element of fraud). The objective standard rests on this rationale: Because a breach of loyalty injures both the client's interests and the legal profession's integrity, the gravity of the harm cannot be cured by good faith. Legal Malpractice, supra, at § 11.3.
Any transaction in which an attorney may have taken undue advantage of the client is voidable. The transaction is rebuttably "presumptively fraudulent." Gwin, 159 Miss. at 645, 126 So. at 22. Upon proper showing, the court may relieve the client of its burden and may grant an equitable remedy. To overcome the presumption, the attorney must prove three things: (1) the transaction's fairness, (2) the client's voluntary entry into the transaction, *824 and (3) the client's full, independent understanding of the nature of the transactions and his or her rights. Lowrey v. Will of Smith, 543 So.2d 1155, 1161-62 (Miss. 1989); Gwin, 159 Miss. at 645, 126 So. at 22. And, of course, an informed and competent client, acting voluntarily, may ratify any such contract or release any such rights.

A. Did Moore breach his duty of loyalty by misrepresenting to Harriett the fee amount Moore was entitled to recover?

1.
Harriett contends that Moore breached his duty of loyalty by misrepresenting the effect of the contract and by attempting to collect an excessive fee based on that misrepresentation. Moore counters: (1) that the contract was ambiguous, and (2) that the ambiguity should be construed against Harriett since she prepared the contract.
A contract between lawyer and client, including a fee contract, should be construed "as a reasonable person in the circumstances of the client would have construed it." American Law Institute, Restatement (Third) of the Law Governing Lawyers (T.D. No. 5, § 29A(2) (1992)). Accordingly, the chancellor examined the contract within its "four corners" and construed it as a reasonable person in the circumstances of the client would have done:
The only reasonable construction here is that the [attorney] would receive 25% of whatever he gained for the [client] over and above what she would have gotten had she not prevailed in the trust litigation  or if no litigation had ever been instituted. It simply makes no sense to conclude that defendant would have agreed to pay a percentage of what she already had, which was one-half of the income of the trust for her lifetime.
The Court holds, therefore, that the [attorney] plaintiff is entitled to 25% of the total stipulated value of the property recovered, less the present value of one-half of the income of the trust for the life expectancy of the defendant.

2.
This Court has reviewed the chancellor's construction and concludes that he correctly found that the contract's language is neither ambiguous nor unclear. Conversely, Moore's construction of the contract lacks any reasonable basis. The contract cannot be construed as Moore construed it "as a reasonable person in the circumstances of the client would have construed it." Restatement of the Law Governing Lawyers, supra. However, by pressing his construction, Moore did not misrepresent the fee arrangement, but did take an advantage to himself and imposed a detriment on his client, Harriett. Moore's failure to overcome the presumption that his unreasonable reading of the language of the fee agreement constituted a breach of duty of loyalty. In other words, Moore: (1) did not prove that the transaction or contract was fair; (2) did not prove Harriett voluntarily entered into the contract as he construed it; and (3) did not prove Harriett independently understood the contract as he construed it. See Gwin, 159 Miss. at 645, 126 So. at 22. Nor has Harriett ratified his conduct. In this respect Moore did breach his duty of loyalty to Harriett in overreaching the amount of fee to which he was entitled under a clear and unambiguous contract on this issue. Flowing from that finding, this Court concludes that she was justified in discharging Moore from representation of her.

B. Did Moore breach the contingency-fee contract by attempting to collect a fee before the conclusion of the first and second suits and by demanding that Harriett pay an additional fee to represent her in the second suit?
Harriett contends that Moore breached his duty of loyalty by attempting to collect his fee before completion of all litigation and by requiring Harriett to pay an additional fee for representing her in the second suit.
The attorney's right to recover a contingency fee cannot vest until the contingency, for which he has contracted, has occurred. *825 See Pollard v. Joseph, 210 Miss. 828, 834-35, 50 So.2d 546, 548 (1950). Moreover, the general rule defining services not covered by the original agreement holds that the attorney must render services as reasonably contemplated, but may ask for extra compensation for wholly unexpected and extraordinary developments. 7A C.J.S. Attorney & Client § 307 (1980). Courts take a skeptical view of such demands, however couched, and require at the very least that the lawyer carry the burden of showing the new fee "to be fair and reasonable to the client." American Law Institute, Restatement (Third) of the Law Governing Lawyers, § 29A(1)(a) and comment d to § 46 (T.D. Nos. 4 and 5, 1991-92). There is an element of the unexpected inherent in every representation. In the distribution of trust funds, for example, attorney's services would cover proceedings through the final accounting. Id. (citing In re Pollen's Estate, 125 Misc. 354, 211 N.Y.S. 626 (Sur. 1925), aff'd, In the Matter of Pollen's Will, 215 N.Y.S. 906 (App.Div. 1926)).
Applying the law to the facts of this case are not as clear, for the facts of this case are unique. Moore had a contingency fee contract with Harriett for a:
25% of the [sic] whatever I receive of my late father's estate, either real or personal, as set forth below if we prevail in establishing my rights .. . over and above one [-] half the income thereof as set forth in the ... Will of Ruth M. Tyson... . It is our further understanding that the fee of 25% shall not be increased even if the case is taken to court or courts of higher jurisdiction than is currently contemplated.
Moore did successfully pursue the constructive trust suit to conclusion and obtain a final judgment from which there was no appeal. His entitlement to a fee is vested.
However, the complication comes when the executors of Ruth Tyson file the second suit to renounce Roberts' 1953 will. Shattuck v. Tyson, 508 So.2d 1077 (Miss. 1987). The issue and parties are different, but the result would affect the amount of recovery in the constructive trust suit, and therefore the amount of Moore's fee entitlement. Moore acknowledged, as did the executors of Ruth's estate, Shattuck, 508 So.2d at 1079, that the second suit served as a "back door" route of appeal for the Ruth Tyson executors to skirt the statutory penalty.
The issues become (1) what is "the case" to which the contract refers and (2) is the renunciation suit the "tak[ing] to court or courts of higher jurisdiction than [was] currently contemplated."
The contract is not subject to as clear-cut an answer on this assignment as the fee question. Both the first chancellor, who described these two cases as "the entire case," (R. 413) and the special chancellor who tried this case, construed the contract to require Moore to defend both suits under the contract terms. This Court concludes also that both chancellors were correct in holding both causes of action covered under this contract as "the case" for one fee, contingent upon ultimate future recovery of assets, over and above that which Harriett was entitled under Ruth's will. However, because of the novel factual situation here, as well as the ambiguity of the words "if the case is taken to court or courts of higher jurisdiction than is currently contemplated," this Court cannot conclude or hold that the attorney breached his duty of loyalty in attempting to collect a fee before completion of the second suit or in seeking an additional fee. It is undisputed that Moore's fee in the first suit had ripened although the amount of that fee may have been diminished, but not eliminated, by the second suit.
On this issue, the court affirms the chancellor's finding that there was no breach of loyalty.

C. Did Moore breach his contingency fee contract by demanding payment in-kind, and asserting ownership in Harriett's property?
Harriett now contends that Moore committed a breach of contract and duty of loyalty by interfering with her use and enjoyment of her property through his assertions of ownership and through his *826 claim that he was entitled to in-kind, rather than cash payment.
In the June 1984 letter from Harriett to Moore, in which she memorialized their agreement, and in which Moore concurred, Harriett wrote: "[Y]our fee is that you will get 25% of the [sic] whatever I receive of my late father's Estate, either real or personal. ... You further agree to pay out of the aforementioned twenty-five percent of proceeds any fees which you incur... ." Moore stated that he and Harriett did not discuss whether the contract specifically granted him the right to in-kind payment.
Moore admitted that attorney Freeland reiterated Harriett's desire to pay in cash during the discharge meeting of February 25, 1986. After Harriett discharged Moore, he asserted an interest in Harriett's property. At a time after Moore's discharge and when Harriett contracted with Carpenter and Gold Timber Company to sell timber, Moore interfered and claimed ownership in the property. Via letter, Moore threatened to sue Carpenter. Harriett stated that she had a buyer for her Highway 311 farm on May 1, 1988, but Moore's lis pendens notice of 1986 on the property prevented the sale.
Regarding attorney liens under Mississippi law, it is not entirely clear that a contingency fee contract gives the attorney a lien on recovered property before the fee has ripened. Cochran v. Henry, 107 Miss. 233, 243-44, 65 So. 213, 216 (1914). Following the Cochran case, this Court held that a contingency fee contract gave an attorney no vested interest in the property under litigation. Pollard v. Joseph, 210 Miss. at 834-35, 50 So.2d at 548. Both these cases addressed the situation where the fee had not ripened, as distinguished from this case where the fee had matured; only the amount was uncertain.
These holdings comport with the policy of Rule 1.8 of the Mississippi Rules of Professional Conduct, which states:
A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:
(1) acquire a lien granted by law to secure the lawyer's fee or expenses; and
(2) contract with a client for a reasonable contingent fee in a civil case.
See also, American Law Institute, Restatement of the Law Governing Lawyers, § 48 (T.D. No. 4 (1991)).
The attorney may have an interest in securing his fee by imposing a lien on property which has already come into the attorney's possession. Mississippi law refers to the attorney's interest as a "retaining" lien. Collins v. Schneider, 187 Miss. 1, 9, 192 So. 20, 22 (1939). The Southern District of Mississippi observed that
an attorney has a lien on all ... money of his client which come[s] into his possession in the course of his professional employment. This lien entitles the attorney to retain possession ... until all his fees are paid.
Brothers in Christ, Inc. v. American Fidelity Fire Ins., 680 F. Supp. 815, 816 (S.D.Miss. 1987) (citing Webster v. Sweat, 65 F.2d 109 (5th Cir.1933)); see also Federal Land Bank of Jackson in Receivership v. Federal Intermediate Credit Bank of Jackson, 127 F.R.D. 473, aff'd in part and rev'd in part, 128 F.R.D. 182 (S.D.Miss. 1989).
Further, a Mississippi attorney may impose a special or charging lien entitling the attorney to recover his fee from the proceeds of the judgment of a case. Webster v. Sweat, 65 F.2d at 110. This lien cannot attach until a judgment is handed down. Id. Like the attorney's retaining lien, the charging lien only applies to funds already in the attorney's possession. Brothers in Christ, 680 F. Supp. at 818; Collins v. Schneider, 187 Miss. 1, 9-10, 192 So. 20, 22 (1939) (quoting Halsell v. Turner, 84 Miss. 432, 434-35, 36 So. 531, 531 (1904)).
Given the attorney's right to retain before judgment and charge after judgment, the next question is against what property the attorney may justifiably retain and charge.
*827 Moore's right to resort to Harriett's property under the law and facts of this case is not clear. His contract extended to "whatever [Harriett] receives from [her] late father's estate, either real or personal," and his fee had vested in the first lawsuit, although the amount of the fee could have been reduced by the second lawsuit. Where the contract provides, as here, that the attorney is entitled to either real or personal, this Court holds that the choice as between the real estate, personal property, or cash should be the choice of the client. The attorney should not take a position in conflict with his client's property.
In view of the terms of the contract here and the uncertainty of our substantive law on what property the attorney may hold, and retain, this Court holds that the chancellor was not manifestly in error in holding that there was no breach of loyalty to his ex-client, this Court affirms.

D. Did Moore violate his fiduciary obligation by failing to inform Harriett of his adverse interest?
Without doubt, a lawyer has a duty to inform his client of all matters of reasonable importance related to the representation or arising therefrom. American Law Institute, Restatement (Third) of the Law Governing Lawyers § 31 (T.D. No. 5 (1992)). This includes advice regarding matters the client may reasonably see as presenting conflicts of interest. Through this issue, Harriett contends that Moore breached his duty by failing to advise her that his interests regarding the fee conflicted with hers and that she should seek the advice of other counsel.
Moore testified that he informed Harriett that he was entitled to one-fourth of her entire estate and that he intended to seize her property as payment. As discussed, Harriett vehemently disputed Moore's construction of the contract and fee arrangement. Harriett testified that she attempted to resolve their dispute, but Moore refused to discuss the matter with her. Moore did not advise Harriett to seek counseling from a third, disinterested party, or seek discussion with her to resolve the dispute.
Moore admitted that he took exception to Harriett's use of her land as collateral for a loan. He worried that Harriett would pledge the land and leave him with no assets from which to secure his fee payment. Moore acknowledged that, in this situation, "there could have been" a problem.
Moore's conduct during the course of litigation, based on his testimony indicates that he held interests adverse to Harriett's. Even if one sets aside the dispute Moore and Harriett had over their construction of the fee contract which should have prompted Moore to suggest to Harriett that she consult with other counsel, other instances of adversity remain.
Moore had the bank issue Harriett's stock to him. By virtue of Moore's position as an attorney for the Bank of Holly Springs, he intervened and prevented Harriett from obtaining a loan at the bank. These actions are reflective of an individual who protected his own interests in opposition to those of his client. Thus, Moore's actions constituted a breach of his duty of loyalty.

E. Whether Moore breached his professional duty when he negligently failed to research and pursue the imposition of a constructive trust on assets remaining in Ruth Tyson's estate?
Harriett contends that Moore damaged her by failing to pursue certain assets for inclusion in the constructive trust of Ruth Tyson's estate. In Moore's investigation into Ruth Tyson's estate, he learned of bank stock, certificates of deposits, and bank accounts in Ruth's name and Kathryn Smallwood's, a sister of Ruth. There was a factual dispute as to whether Harriett knew of all this property and waived pursuit of them in the constructive trust suit. Moore only stated that the suit did not seek those proceeds and admitted he did not investigate the source of the income in Ruth's acquisition of them.
*828 In the April 1984 attempt of Ruth Tyson's executors to renounce Robert Tyson's will the issue of these certificates of deposit, bank stock, and accounts did not arise. Tyson testified that she learned of the bank stock from her new attorney Freeland. The trust theory of the bank stock was then advanced by Harriett in federal litigation. Tyson v. Pathmann, 688 F. Supp. 240 (N.D.Miss. 1988), aff'd 872 F.2d 421 (5th Cir.1989). The federal court granted the defendants summary judgment holding that the state court action had decided what underlying property constituted the corpus of the trust.
The chancellor in the present suit found that the evidence before him never established the source of Ruth Tyson's funds used to establish these assets. These assets were not a part of Robert A. Tyson's estate at his death. Further, the chancellor found that Harriett was "fully informed" of Moore's intent not to seek recovery and "at least impliedly consented to what seems to have been a strategic decision."
This Court has perused the record and relevant law and concludes that Harriett has failed to prove the merits of her contention. Estate of Susie Mae Stamper, Deceased: Marshall Bernard Stamper, Jr. v. Nellie Joe Edwards, Administratrix, Francis Williams, Marcus Williams, and Bob Williams, 607 So.2d 1141 (Miss. 1992). See generally Stewart v. Walls, 534 So.2d 1033, 1035 (Miss. 1988); Hartford, 528 So.2d at 275; Hickox v. Holleman, 502 So.2d 626, 633 (Miss. 1987); Dean v. Conn, 419 So.2d 148, 150 (Miss. 1982); Hutchinson v. Smith, 417 So.2d 926, 927-28 (Miss. 1982); Nause v. Goldman, 321 So.2d 304, 307-08 (Miss. 1975); Thompson v. Erving's Hatcheries, Inc., 186 So.2d 756, 759 (Miss. 1966). The chancellor is affirmed on this issue.

F. Remaining Issues
The remaining issues have been deemed moot or devoid of merit.

III. CONCLUSION
Thus, in conclusion this Court holds that Moore did have a contract with Harriett, but that he breached it by overreaching the terms by asserting an excessive fee and failing to inform Harriett of this adversarial stance regarding the fee. The next question is what damages flow from that action. As discussed, any transaction through which an attorney is deemed to have breached his fiduciary duty and taken undue advantage of his client is voidable. Under proper proof, the court may nullify the transaction, relieve the client of its burdens, and order an equitable remedy of and from the attorney. Gwin, 159 Miss. at 645, 126 So. at 22. Because a breach of duty of loyalty damages both the client's interests and the legal profession's integrity, the gravity of the harm cannot be cured by a showing of good faith. Thus, applicable law dictates that, in view of Moore's actions in overreaching and in misinterpreting the amount of his fee under their employment contract, and taking an adverse position to his client, his fee under the contract with Harriett must be held unenforceable.
On the other hand, the Court does not deem Moore's conduct so egregious that he must forfeit a right to any fee at all. He did successfully conclude the constructive trust suit. This Court is cognizant of Harriett's testimony through which she acknowledged that Moore deserved some compensation in recognition of the amount of work he had successfully performed in her behalf. It is clear Moore's efforts produced for Harriett substantial benefits. With this in mind, this Court reverses and remands to the chancery court for its determination of compensation owed to Moore. Moore is not entitled to a twenty-five (25%) fee, but only to such fee as the chancellor may find to be reasonable for the work performed by Moore for Tyson, less any losses caused the client by Moore's adversarial and inappropriate actions. See Estate of Johnson v. Adkins, 513 So.2d 922, 926 (Miss. 1987); Koval v. Koval, 576 So.2d 134, 136-37 (Miss. 1991). Since this Court determines that the contract required representing Harriett in the Shattuck suit, the court should consider any amounts which Harriett has had to expend to retain other *829 counsel to complete the Shattuck v. Tyson litigation and to defend her position in this dispute. His fee may also be diminished by any damages by way of loss of profit in timber and real estate sales which she would have realized but for Moore's lis pendens notice. Finally, in the event that Harriett's property must be valued in order to determine Moore's compensation, the appropriate date for such valuation should be no later the the date of Moore's discharge. On remand, the chancellor is directed to make the proper computations.
REVERSED AND RENDERED AS TO THE CHANCELLOR'S VALIDATION OF THE CONTRACT.
REVERSED AND REMANDED TO THE CHANCERY COURT OF MARSHALL COUNTY FOR DETERMINATION OF COMPENSATION OWED TO MOORE.
AFFIRMED AS TO ALL OTHER REMAINING ISSUES NOT MOOTED BY THIS DECISION.
DAN M. LEE, P.J., and SULLIVAN, BANKS and McRAE, JJ., concur.
HAWKINS, C.J., not participating.
PITTMAN, J., dissents to the modification of the original opinion.
ROBERTS and SMITH, JJ., not participating according to Supreme Court Internal Rules.
NOTES
[1] Ruth adopted Marjorie Harriett and then changed her name to Roberta Alexander.
[2] The suit did not involve $100,000 in bank deposits and certificates of deposit titled in Ruth and a third party's name.
[3] Harriett asked Hurdle for his help as a friend and not an attorney.
[4] Specifically, this Court held that the right of a surviving spouse to revoke provisions of a will is a personal right which must be exercised in his or her lifetime, and the personal representative of the surviving spouse may not exercise the right after the latter's death. Shattuck v. Tyson, 508 So.2d 1077 (Miss. 1987).