IRVING, P.J.,
dissenting:
¶ 108. In this case, James R. Forbes filed suit against his attorney, Louis St. Martin, and St. Martin’s law firm, St. Martin, Mahoney & Associates, alleging legal malpractice, fraud, and conversion. On June 8, 2007, St. Martin[6] filed a motion for summary judgment, which the Harrison County Chancery Court granted.
¶ 109. In this appeal, Forbes frames the issue in the summary-of-the-argument portion of his brief as follows:
This case is not a traditional legal malpractice case where a client contends that the attorney’s handling of the legal matter fell below the standard of care resulting in the client losing his case.
What is at issue are the contingent fee contracts(s) and the facts surrounding their formation.
[[Image here]]
Forbes has never taken issue with the representation he received in connection with his personal injury matter and/or that the settlement he received was inadequate. What is at issue was whether he was competent at the time the contracts) were signed, whether the contracts were tainted by misrepresentation, improper influence or inducement, and the withholding of material facts. Forbes clearly indicated in his deposition testimony that the first contract was never shown or read to him and he had no knowledge [of] its terms.
Notwithstanding the diametrically opposed testimony regarding the formation of these contracts, which alone should have prevented summary judgment, Forbes also demonstrated that St. Martin had breached his fiduciary obligations to him by improperly soliciting the representation, by offering illegal cash advances to his wife for the execution of the contract, by withholding material information which was disadvantageous to him, by having him execute contracts which were void against public policy, and as a result he should be relieved from them terms.
Moreover, there are grave public policy concerns attached with affirming the Chancellor’s grant of summary judgment in this matter. If this Court affirms it will santion unethical, illegal and improper behavior by out-of-state attorneys. Ethical members of the Mississippi Bar will [be] disadvantaged and not be able to fairly compete. Affirming the judgment below will: sanction the *1213 direct and personal solicitation of personal injury clients in their hospital room; authorize the advancement of cash payments directly to clients upon signing a contract for representation; and, encourage attorneys to race to the courthouse to improperly intercede in matters in which they have not been retained.
The majority agrees with Forbes and finds that the chancery court erred in granting summary judgment. I disagree; therefore, I dissent. I would affirm the judgment of the chancery court.
¶ 110. First, I should point out that Forbes makes no complaint concerning the quality of the representation provided. Therefore, it is difficult for me to see how he can assert that this is a legal negligence case, though not a traditional one. Nevertheless, I will address the issues that the majority finds troubling, though not delineated or addressed by Forbes as required by our rules. In order to do so, I first need to set forth the relevant facts that support my view that summary judgment was appropriate.
¶ 111. On August 9, 1998, Forbes sustained serious injuries following an explosion at a gas station in Biloxi, Mississippi. Forbes was transported to the burn unit at the University of South Alabama Medical Center in Mobile, Alabama, for treatment. Shortly after the accident, a relative of Lisa Forbes, Forbes’s wife, contacted St. Martin and explained that Forbes had been seriously injured in an accident and asked him to visit Forbes in the hospital.
¶ 112. On August 11, 1998, St. Martin traveled from his office in Houma, Louisiana, to Mobile to meet with Forbes. When he arrived, he learned that Forbes was in a coma. However, St. Martin spoke with Lisa about representing Forbes in a personal-injury lawsuit. Lisa agreed to hire St. Martin and executed a contingency-fee agreement that day. Under the agreement, St. Martin would receive 33 1/3% of any settlement received in the case. If a lawsuit was filed in Texas, St. Martin was to receive 40% of any settlement or judgment obtained.[7] St. Martin never saw or spoke to Forbes that day, nor did Forbes sign the agreement.
¶ 113. Because St. Martin was not licensed in Mississippi, he associated Jon Mark Weathers, a Mississippi attorney who practiced with the law firm then known as Bryan, Nelson, Randolph & Weathers P.A. St. Martin and Weathers agreed to split any fee recovered 50/50. Weathers drafted the complaint related to Forbe’s personal-injury lawsuit and filed it on August 17, 1998. St. Martin did not sign the complaint or enter an appearance as counsel of record in the case. According to St. Martin, he acted as a liaison between Forbes and Weathers.
¶ 114. In October 1998, St. Martin visited Forbes, who was no longer in a coma, at the hospital. St. Martin testified in his deposition that he and Forbes discussed St. Martin’s representation as well as the fee associated with handling his claim. According to St. Martin, he asked Forbes to sign a contract, but Forbes’s injuries prevented him from using his hands. Forbes testified in his deposition that he did not remember being asked to sign a contract during the visit. However, he testified that he knew Lisa had retained St. Martin as his attorney and that she had signed a contract under which St. Martin would receive 33 1/3% of any recovery. Forbes was discharged from the hospital *1214 to a rehabilitation facility on November 25, 1998.
¶ 115. On June 10, 1999, Forbes and Lisa traveled to St. Martin’s office in Louisiana to discuss a proposed settlement offer. Ultimately, they decided to reject an offer to settle their case for $5 million. The same day, St. Martin asked Forbes and Lisa to execute a second contingency-fee agreement. The second contract provided for attorney’s fees of 38 1/3% of any settlement.[8] The contract also prohibited Lisa and Forbes from terminating St. Martin as their attorney for any reason other than negligently handling their claim. If they terminated St. Martin for other reasons, he was entitled to his full fee as provided under the contract. St. Martin testified that before Forbes and Lisa signed the second contract, he informed them that he would be willing to pursue their claim on an hourly basis. However, he explained that his offer was contingent on Forbes and Lisa first receiving a partial settlement.
¶ 116. Forbes ultimately settled his personal-injury claim for $13.6 million, of which attorneys’ fees totaled $4.6 million. Sometime later, Forbes and Lisa filed for divorce. Forbes retained Stephen J. Mag-gio as his attorney. Forbes testified in his deposition that Maggio suggested that he file suit against the attorneys who had represented him in his personal-injury suit because they had “shortchanged [him] somehow.”
¶ 117. As stated, Forbes sued St. Martin, Weathers, and their respective law firms, alleging legal malpractice, fraud, and conversion.[9] Additionally, Forbes sought rescission of the June 10, 1999 contract and the establishment of a constructive trust. Finally, Forbes sought attorneys’ fees and punitive damages.
¶ 118. Special Chancellor Gene Barlow rendered a twenty-nine-page opinion in which he thoroughly addressed the issues that Forbes raised below and presents in this appeal. I now address the issues in turn.

a. August 11, 1998 Contract

¶ 119. It is undisputed that at the time Lisa signed the first contract with St. Martin, Forbes was in a coma and was not competent to enter into a contract.[10] *1215 However, based on my review of the record, Forbes ratified the contract entered into by his wife. “Ratification is the affir-mance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.” Barnes, Broom, Dallas & McLeod, PLLC v. Estate of Cappaert, 991 So.2d 1209, 1212 (¶ 11) (Miss.2008) (quoting Autry v. State, 698 So.2d 84, 87 (¶ 10) (Miss.1997)). Proof of ratification may be in the form of either “affirmative acts or inaction.” Id. (citing Autry, 698 So.2d at 87 (¶ 11)).
¶ 120. Forbes testified in his deposition that Lisa had informed him that she had retained St. Martin and that he did not disagree with her decision. Forbes also did not voice any concerns regarding St. Martin’s representation of him or the terms of the contract during St. Martin’s October 1998 hospital visit. While Forbes was still recovering from his significant injuries in October 1998, there is no indication that he was unable to understand that his wife had entered into a contingency-fee agreement on his behalf and that under the terms of the agreement, St. Martin would receive 33 1/3% of any settlement. Therefore, I agree with the the chancery court that Forbes ratified the August 11, 1998 contract.

b. June 10, 1999 Contract

¶ 121. In his deposition, Forbes testified that at the time he and Lisa executed the June 10, 1999 contract, he was in “rough shape” and taking medications. However, he consistently testified that he understood the terms of the contingency-fee agreement that he had executed with St. Martin. In support of his argument that he was incompetent at the time he executed the June 10, 1999 contract, Forbes points to a report from Dr. Donald Guild, a psychiatrist who evaluated him on June 24, 1999. While Dr. Guild determined that Forbes “appearefd] to be suffering from significant depression,” he stated that Forbes appeared “oriented, alert, [had a] fairly good memory, and [there was] no evidence of psychosis.” Based on these facts, it is clear that Forbes failed to present sufficient evidence that there was a genuine issue of material fact regarding his competence on June 10, 1999.
c. Contract Provisions
¶ 122. Forbes also argues that certain clauses contained in both the August 11, 1998 and June 10, 1999 contracts render each of the contracts void. The contract provisions of which Forbes complains are as follows:
My(Our) attorney is to have the exclusive handling of this claim[,] and I(we) will cooperate with him. No compromise can or will be made without my(our) signature(s) and without the approval and signature of my(our) attorney. My(Our) attorney, of course, must do everything he can toward the proper handling on my(our) claim.
My(Our) attorney may be fired only for negligent handling of my(our) claim or failure to pursue my(our) claim with ordinary legal diligence. In all other cases, my(our) attorney is entitled to a full fee as outlined above for any settlement I(we) receive in the above matter, even though other counsel may be consulted or hired.
¶ 123. The Mississippi Supreme Court has previously held that contractual provisions that limit a client’s ability to settle his case without his attorney’s consent are invalid and unenforceable. Collier v. Necaise, 285 So.2d 778, 782 (Miss.1973). Our supreme court has also stated: “It is a settled rule that because of the special relationship of trust and confidence between attorney and client, the client, may *1216 terminate the relationship at any time, with or without cause.” Poole v. Gwin, Lewis & Punches, LLP, 792 So.2d 987, 989-90 (¶ 9) (Miss.2001) (citation omitted). Therefore, the provisions limiting Forbes’s ability to settle his claim without St. Martin’s authorization or to terminate St. Martin for reasons other than negligence are invalid. However, under Mississippi law, invalid provisions in a contract do not render the entire contract void. Instead, a court may strike invalid provisions without voiding the entire contract. Russell v. Performance Toyota, Inc. 826 So.2d 719, 725 (¶ 21) (Miss.2002). Accordingly, the above provisions, while invalid, do not render the entire contingency-fee agreement void.
¶ 124. The majority states that Weathers’s knowledge “that St. Martin was planning to take care of the Forbeses’ living expenses ... would be sufficient to void the contract.” Maj. Op. at (¶ 36). However, the majority cites no authority for that pronouncement nor explains how Weathers’s inaction with respect to an ethical matter can void a contract to which he is not a party. The majority also states: “There is clear and abundant Mississippi authority that St. Martin’s improper advance of almost $100,000 to the Forbeses was conduct that would void the contingency-fee contract.” Maj. Op. at (¶ 34). Yet, the majority does not cite a single Mississippi case for that proposition.

d. Solicitation & Cash Advances

¶ 125. Forbes argues that the contingency-fee agreements should also be voided based on St. Martin’s unethical actions during the course of his representation of Forbes and Lisa. Specifically, Forbes contends that St. Martin solicited the Forbes-es as clients and made significant cash advances to them in violation of the Mississippi Rules of Professional Conduct.
¶ 126. St. Martin testified in his deposition that Lisa’s aunt had contacted him regarding Forbes’s accident and requested that St. Martin visit Forbes in the hospital. Additionally, Lisa testified in her deposition that she knew that her aunt had contacted St. Martin and that she was expecting St. Martin at the hospital. Based on St. Martin’s and Lisa’s deposition testimonies, I see no basis for finding that there is a genuine issue of material fact with respect to whether St. Martin improperly solicited the Forbeses.
¶ 127. St. Martin admitted in his deposition that he had advanced the Forbeses nearly $100,000 during the pendency of the case. While St. Martin explained that a significant portion of the cash advances was used to pay for Forbes’s medical expenses, he admitted that he made cash advances for a Bahamian vacation, a Caribbean cruise, a car, cell phones, and other personal expenses. St. Martin’s cash advancements were certainly in violation of Rule 1.8(e) of the Mississippi Rules of Professional Conduct;[11] however, there is *1217 no authority for Forbes’s argument that violation of the ethical rule governing cash advancements voids a contingency-fee contract.[12] Moreover, unless St. Martin was practicing law in Mississippi, the rules would not have applied to him. In .my judgment, based on the fact that St. Martin did nothing in Mississippi to represent Forbes, there is no genuine issue of material fact regarding this point.
¶ 128. Forbes also contends that the cash advances he and his wife received from St. Martin amounted to undue influence and that the contingency-fee agreements should be voided on that basis. “Any transaction in which an attorney may have taken undue advantage of the client is voidable.” Tyson v. Moore, 613 So.2d 817, 823 (Miss.1992). Such transactions are “presumptively fraudulent,” but the presumption may be overcome following proof of: “(1) the transaction’s fairness, (2) the client’s voluntary entry into the transaction, and (3) the client’s full, independent understanding of the nature of the transactions and his or her rights.” Id. at 823-24 (citations omitted). Furthermore, “an informed and competent client, acting voluntarily, may ratify any such contract....” Id. at 824.
¶ 129. First, I point out that there is no evidence that any money changed hands prior to Lisa signing the first contract. While there was evidence that St. Martin gave Lisa $700[13] on the day that she signed the first contract, there is absolutely no evidence that the money changed hands prior to Lisa executing the contract. *1218 Therefore, it cannot be said that the giving of the money constituted undue influence on her, causing her to sign the contract. Nor is there any evidence that St. Martin gave the money to the Forbeses as consideration for having been employed by Lisa and Forbes to handle Forbes’s lawsuit. Any notion to that effect was dispelled by Forbes, who expressly stated in his deposition that St. Martin did nothing to induce him or Lisa to sign either of the contracts. And he consistently stated that he agreed with his wife’s decision to execute the August 11, 1998 contract. Forbes also testified that he understood the terms of the contingency-fee agreement that he executed with St. Martin and believed that they were fair. Furthermore, he testified that St. Martin “did an excellent job” representing him and had acted in his best interests. Finally, he testified that he did not want to file suit against St. Martin but that Maggio had convinced him to sue. Based on Forbes’s statements, I fail to see how a genuine issue of material fact exists regarding whether St. Martin took undue advantage of him. Therefore, I find that Forbes’s argument now that the contracts were the product of undue influence is not undergirded by the facts.
e. Unauthorized Practice of Law
¶ 130. The question is whether there are genuine issues of fact as to whether St. Martin engaged in the unauthorized practice of law in Mississippi. Our supreme court has previously stated:
The practice of law includes the drafting or selection of documents, the giving of advice in regard to them, and the using of an informed or trained discretion in the drafting of documents to meet the needs of the person being served. So any exercise of intelligent choice in advising another of his legal rights and duties brings the activity within the practice of the legal profession.
Darby v. Miss. Bd. of Bar Admissions, 185 So.2d 684, 687 (Miss.1966) (citation omitted). However, the above list is not all-inclusive, and determining what other activities might constitute the practice of law falls within the inherent authority of the courts. Id. at 687-88.
¶ 181. The majority finds that St. Martin engaged in the unauthorized practice of law based on our supreme court’s holding in In re Williamson, 838 So.2d 226 (Miss.2002). The foreign attorney in In re Williamson actively solicited clients in Mississippi through advertisements, conferred with those clients and advised them of their legal rights, allowed his name to appear on multiple pleadings filed in Mississippi courts, and conducted depositions in Mississippi. Id. at 235-36 (¶¶ 23-25, 27). Based on these actions, our supreme court held that the foreign attorney had engaged in the unauthorized practice of law in Mississippi. Id. at 236 (¶ 27).
¶ 132. The facts in our case are far different than the facts in In re Williamson. There is no evidence in the record that St. Martin advertised in Mississippi or otherwise solicited clients in this state. He also did not solicit Lisa and Forbes. Lisa testified that her aunt contacted St. Martin. St. Martin did not file an entry of appearance in Forbes’s case or sign any pleadings, although his name appeared as “of counsel” on the complaint. In a letter dated August 16, 1998, Weathers informed St. Martin that he would list him as “of counsel” on the complaint. However, in a letter dated October 28, 1998, to opposing counsel, Weathers explained that St. Martin “will not be participating as an attorney in this matter, will not be enjoying ‘Of Counsel’ status, and has no intention, at this time, of seeking admission to the Mississippi [B]ar on a pro hac vice basis.” Weathers then instructed opposing counsel to remove St. Martin from the service list. *1219 St. Martin attended depositions related to Forbes’s case; however, he testified that he did not participate in the depositions, and there is no evidence contradicting his testimony. Finally, at his Louisiana office, St. Martin counseled and advised Lisa and Forbes regarding settlement. There is no evidence in the record that St. Martin counseled or advised Lisa and Forbes in Mississippi.
¶ 133. Certainly the above actions, most of which took place at St. Martin’s law office in Louisiana, do not raise a genuine issue as to whether St. Martin engaged in the unauthorized practice of law in Mississippi. St. Martin agreed to provide legal services in a single Mississippi case. All of his efforts, with the exception of attending — but not participating in — depositions, occurred in Louisiana. Based on these facts, I find that there is no genuine issue of fact as to whether St. Martin engaged in the unauthorized practice of law in Mississippi.
¶ 134. The majority states that St. Martin’s June 10, 1999 letter to Weathers creates a genuine issue of fact as to whether St. Martin practiced law in Mississippi. Apparently, the majority thinks that St. Martin’s giving advice to the Forbeses at his office in Louisiana, after the Forbeses had voluntarily traveled from Mississippi to see him, was practicing law in Mississippi. The majority offers no authority for this statement or otherwise explains (1) how a discussion in Louisiana between St. Martin and the Forbes constituted St. Martin practicing law in Mississippi, or (2) how such conduct raises a genuine issue of fact as to whether he practiced law in Mississippi.
¶ 135. On the facts presented, I find that the chancery court did not err in granting summary judgment in favor of St. Martin. Forbes ratified the August 11, 1998 contract executed by his wife and was competent to execute the June 10, 1999 contract. Additionally, while the provisions limiting the Forbeses’ ability to settle their claim or terminate St. Martin are invalid, the chancery court correctly found that they did not void the contracts. The chancery court properly found that based on Forbes’s testimony, the contracts were not the product of undue influence.
¶ 136. For the reasons presented, I dissent.
LEE, C.J., JOINS THIS OPINION.

. Hereinafter, reference to St. Martin will be to the individual unless otherwise indicated.

. Following Lisa's execution of the agreement, St. Martin gave her $700 in cash for living expenses.

. The contract also provided that if the case went to trial, St. Martin would be entitled to 40% of any judgment or subsequent settlement.

. St. Martin’s partner, Estelle Mahoney, was also listed as a defendant, but she was dismissed from the suit by an agreed order on June 12, 2008. Weathers and his law firm, Bryan, Nelson, Randolph & Weathers P.A., were also dismissed during the pendency of the litigation. Accordingly, neither party is involved in the present appeal.

. Forbes also takes issue with the fact that St. Martin failed to establish a conservator-ship. However, under Rule 1.14(b) of the Mississippi Rules of Professional Conduct, the establishment of a conservatorship is not mandatory:
A lawyer may seek the appointment of a guardian or take other protective action with respect to a client only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest.
(Emphasis added). In a letter to St. Martin dated August 16, 1998, Weathers wrote: “We may want to consider appointing Lisa Forbes as the conservatrix of James Forbes due to his present condition. Once appointed, your contract could be approved and authority obtained to proceed with a lawsuit.” St. Martin testified in his deposition that he had approached Lisa about establishing a conserva-torship, but she did not wish to institute the proceedings. Given the permissive language of Rule 1.14(b), I find that Forbes’s argument that the chancery court erred in granting summary judgment based on St. Martin's failure to establish a conservatorship is without merit.

. Rule 1.8(e) provides:
A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, or administrative proceedings, except that:
1. A lawyer may advance court costs and expenses of litigation, including but not limited to reasonable medical expenses necessary to the preparation of the litigation for hearing or trial, the repayment of which may be contingent on the outcome of the matter; and
2. A lawyer representing a client may, in addition to the above, advance the following costs and expenses on behalf of the client, which shall be repaid upon successful conclusion of the matter.
a. Reasonable and necessary medical expenses associated with treatment for the injury giving rise to the litigation or administrative proceeding for which the client seeks legal representation; and
b. Reasonable and necessary living expenses incurred.
*1217 The expenses enumerated in paragraph 2 above can only be advanced to a client under dire and necessitous circumstances, and shall be limited to minimal living expenses of minor sums such as those necessary to prevent foreclosure or repossession or for necessary medical treatment. There can be no payment of expenses under paragraph 2 until the expiration of 60 days after the client has signed a contract of employment with counsel. Such payments under paragraph 2 cannot include a promise of future payments, and counsel cannot promise any such payments in any type of communication to the public, and such funds may only be advanced after due diligence and inquiry into the circumstances of the client.
Payments under paragraph 2 shall be limited to $1,500 to any one party by any lawyer or group or succession of lawyers during the continuation of any litigation unless, upon ex parte application, such further payment has been approved by the Standing Committee on Ethics of the Mississippi Bar. An attorney contemplating such payment must exercise due diligence to determine whether such party has received any such payments from another attorney during the continuation of the same litigation, and, if so, the total of such payments, without approval of the Standing Committee on Ethics shall not in the aggregate exceed $1,500.
Upon denial of such application, the decision thereon shall be subject to review by the Mississippi Supreme Court on petition of the attorney seeking leave to make further payments. Payments under paragraph 2 aggregating $1,500 or less shall be reported by the lawyer making the payment to the Standing Committee on Ethics within seven (7) days following the making of each such payment. Applications for approval by the Standing Committee on Ethics as required hereunder and notices to the Standing Committee on Ethics of payments aggregating $1,500 or less, shall be confidential.

. Furthermore, it is well settled that "[v]iolation of a Rule of Professional Conduct does not give rise to a cause of action[,] nor does it create a presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers.... They are not designed to be a basis for civil liability.” Pierce v. Cook, 992 So.2d 612, 625-26 (¶ 42) (Miss.2008) (quoting M.R.P.C. Scope).

. I use the word "gave” as meaning that he transferred $700 from his hand to hers. He did not transfer the money without expectation of being repaid. It is more accurate to say that he advanced the $700 and other amounts until the case could be settled. All of the money that was advanced was deducted from Forbes’s share of the settlement.