GRIFFIS, P.J.,
for the Court:
¶ 1. James R. Forbes appeals the grant of summary judgment in favor of Louis St. Martin (“St.Martin”) and St. Martin, Ma-honey & Associates, Professional Law Corporation (the “St. Martin firm”). Finding error, we reverse and remand for further proceedings.
*1187 FACTS

I. Background and Course of Proceedings

¶ 2. On August 9, 1998, Forbes was seriously injured in a gas-station explosion in Biloxi, Mississippi. St. Martin and the St. Martin firm represented Forbes in a civil action to recover damages that resulted from his injuries. St. Martin was a licensed Louisiana lawyer and was not licensed to practice law in Mississippi. St. Martin associated a licensed Mississippi lawyer, Jon Mark Weathers (“Weathers”), and his firm, Bryan, Nelson, Randolph and Weathers P.A. (the “Bryan Nelson firm”), to serve as local counsel. Forbes’s personal-injury lawsuit was filed in Mississippi and resulted in a substantial recovery.
¶ 3. This civil action commenced on July 30, 2001. Forbes’s complaint named St. Martin, the St. Martin firm, Weathers, and the Bryan Nelson firm as defendants. The complaint asserted claims for breach of fiduciary duty, professional negligence, fraud and misrepresentation, conversion, rescission, imposition of a constructive trust, quantum merit, attorney’s fees, and actual and punitive damages. Weathers and the Bryan Nelson firm were dismissed. Forbes was allowed to amend his complaint and assert an additional claim for a declaratory judgment against the malpractice insurance carrier for St. Martin and the St. Martin firm. The amended complaint was filed on April 16, 2008.
¶ 4. Both parties filed motions for summary judgment. On May 27, 2009, Forbes filed a supplemental motion for partial summary judgment, and St. Martin filed a supplemental motion for summary judgment. The chancellor heard the motions on August 12 and 13, 2009.
¶ 5. On October 1, 2009, the chancellor issued his ruling and judgment on the motions for summary judgment. The chancellor granted St. Martin’s motion and dismissed all claims in Forbes’s amended complaint. The chancellor also denied Forbes’s motion. On October 9, 2009, Forbes filed a motion for reconsideration of the judgment. The chancellor denied this motion on February 2, 2010. Forbes filed his notice of appeal on March 2, 2010.

II. The Underlying Personal-Injury Action

¶ 6. After his injury on August 9, 1998, Forbes was transported for treatment to the burn unit at the University of South Alabama Medical Center in Mobile, Alabama. A relative of Lisa Forbes, Forbes’s wife, apparently contacted St. Martin and explained that Forbes had been seriously injured in an accident. St. Martin was asked to visit Forbes in the hospital.
¶ 7. Two days later, on August 11, St. Martin traveled from his office in Houma, Louisiana, to Mobile to meet with Lisa and Forbes. When St. Martin arrived, Forbes was in a coma. St. Martin spoke with Lisa about representing them in a personal-injury lawsuit. Lisa agreed to hire St. Martin and executed a contingency-fee contract that day. The August 11, 1998 contract reads:

Contract of Employment

State of Louisiana Parish of Terrebonne
Know all men by these presents that:
I(We) Lisa Forbes (hereinafter referred to as “client”) hereby employ and retain St. Martin, Mahoney & Associates (A Professional Law Corporation), (hereinafter referred to as “attorney”) to handle any and all claims that I(we) may have against Texaco, Inc,, and any and all other responsible parties as a result of the injuries sustained in an explosion at Texaco Gas Station in Biloxi.
*1188 I(We) hereby agree to pay said attorney thirty-three and one-third (33 1/3%) of any settlement or judgment obtained in said case as the fee for his services. If my attorney files suit in Texas I agree to pay a fee of forty (40%) percent of any settlement or judgment obtained.
All reasonable and necessary expenses incurred and paid by said attorney on behalf of client shall be reimbursed by client upon settlement or completion of the claim. The aforementioned reimbursements to attorney are in addition to the fee and charges for professional and legal services and the representation of the client as per this agreement. The fee will be calculated on the total amount of the settlement and before any deduction of expenses.
My(our) attorney is to have the exclusive handling of this claim and I(we) will cooperate with him. No compromise can or will be made without my(our) signature(s) and without the approval and signature of my(our) attorney. My(our) attorney, of course, must do everything he can toward the proper handling of my(our) claim.
My(our) attorney may be fired only for negligent handling of my(our) claim or failure to pursue my(our) claim with ordinary legal diligence. In all other cases, my(our) attorney is entitled to a full fee as outlined above for any settlement I(we) receive in the above matter, even though other counsel may be consulted or hired.
I(We) have signed this agreement only after reading and explanation by the abovementioned attorney.
/s/ Lisa Forbes
Sworn to and subscribed before me this 11 day of August, 1998.
/s/ Louis St. Martin Notary Public
St. Martin gave Lisa $700 in cash for living expenses after she signed the contract. St. Martin did not see or speak with Forbes that day, and Forbes did not sign the contract.
¶ 8. St. Martin began work on Forbes’s case. St. Martin was not a licensed attorney in the State of Mississippi. He associated Weathers to serve as his co-counsel. St. Martin and Weathers agreed to split any fee recovered on a 50/50 basis. Weathers drafted a personal-injury complaint. The complaint was filed on August 17, 1998, in the Circuit Court of Harrison County, Mississippi. St. Martin did not sign the complaint, but his name was included “of counsel.”
¶ 9. In October 1998, St. Martin visited Forbes in the hospital. Forbes was no longer in a coma. St. Martin testified that he discussed his representation with Forbes and the fee associated with handling his claim. St. Martin testified that he asked Forbes to sign a contract, but Forbes’s injuries prevented him from using his hands. Forbes testified that he did not remember being asked to sign a contract during this visit. However, Forbes stated that he knew that Lisa had retained St. Martin as his attorney and that she had signed a contract under which St. Martin would be compensated for his efforts.
¶ 10. Forbes was discharged from the hospital to a rehabilitation facility on November 25,1998.
¶ 11. On June 10, 1999, Lisa and Forbes traveled to St. Martin’s office in Louisiana to discuss a proposed settlement offer. Upon the recommendation of St. Martin, Forbes and Lisa decided to reject a $5 million settlement offer.
¶ 12. At this meeting, St. Martin asked Lisa and Forbes to execute a second contingency-fee contract. The terms of this contract changed the attorney’s fees compensation and prohibited the termination *1189 of St. Martin as their attorney. St. Martin testified that before Lisa and Forbes signed the second contract, he informed them that he would be willing to pursue their claim on an hourly basis. However, he explained that his offer was contingent on Forbes and Lisa first receiving a partial settlement. The June 10, 1999 contract reads:

Contract of Employment

State of Louisiana
Parish of Terrebonne
Know all men by these presents that:
I(We) James Forbes (hereinafter referred to as “client”) hereby employ and retain St. Martin, Mahoney & Associates (A Professional Law Corporation), (hereinafter referred to as “attorney”) to handle any and all claims that I(we) may have against PREMIUM TANK LINES, INC., R.R. MORRISON & SON, INC., THEIR RESPECTIVE INSURANCE COMPANIES, and any and all other responsible parties as a result of the injuries sustained in an ACCIDENT ON OR ABOUT August 9, 1998.
I(We) hereby agree to pay said attorney thirty-three and one-third (33 1/3%) of any settlement obtained in said case as the fee for his services. If my attorney has to try my case, I(we) agree to pay a fee of forty (40%) percent of any settlement or judgment obtained.
All reasonable and necessary expenses incurred and paid by said attorney on behalf of client shall be reimbursed by client upon settlement or completion of the claim. The aforementioned reimbursements to attorney are in addition to the fee and charges for professional and legal services and the representation of the client as per this agreement. The fee will be calculated on the total amount of the settlement and before any deduction of expenses.
My(our) attorney is to have the exclusive handling of this claim and I(we) will cooperate with him. No compromise can or will be made without my(our) signature(s) and without the approval and signature of my(our) attorney. My(our) attorney, of course, must do everything he can toward the proper handling of my(our) claim.
My(our) attorney may be fired only for negligent handling of my(our) claim or failure to pursue my(our) claim with ordinary legal diligence. In all other cases, my(our) attorney is entitled to a full fee as outlined above for any settlement I(we) receive in the above matter, even though other counsel may be consulted or hired.
I(We) have signed this agreement only after reading and explanation by the abovementioned attorney.
/$/ James Forbes
/s/ Lisa Forbes
Sworn to and subscribed before me this LL day of August, 1998.
/s/ LSM Notary Public
¶ 13. Forbes ultimately settled his personal-injury claim for $13.6 million. The attorneys were paid $4.6 million.
ISSUES PRESENTED
¶ 14. Forbes’s brief presents two issues, which we quote:
A. Whether the Chancery Court erred in granting summary judgment to the Defendants below as there were genuine issues of material fact and the Defendants were not entitled to summary judgment as a matter of law.
B. Whether the Chancery Court erred in denying the post-judgment motion of the Plaintiff pursuant to M.R.C.P. 59.
*1190 ¶ 15. There is actually only one issue in this appeal — whether it was error to grant the summary judgment. A chancellor’s judgment is final and appealable, and there is no requirement that a post-judgment motion be filed to perfect an appeal from chancery court.
¶ 16. In chancery court, a Rule 59(a) motion may be filed: (i) “for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of Mississippi,” or (ii) for a new trial so “the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.” A Rule 59(e) motion would allow the chancellor to “alter or amend the judgment.”
¶ 17. Forbes’s brief contends that the chancellor erred in the denial of the motion for reconsideration. “[A] motion to set aside or reconsider an order granting summary judgment will be treated as a motion under Rule 59(e).” Brooks v. Roberts, 882 So.2d 229, 233 (¶ 15) (Miss.2004) (citation omitted). “[T]he movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice.” Id. (citation omitted). A chancellor’s decision to deny a Rule 59 motion is reviewed for abuse of discretion. Brooks, 882 So.2d at 233 (¶ 15). Forbes has offered no argument that the chancellor abused his discretion in the denial of the motion for reconsideration. Accordingly, we find no error as to the second issue, and we only consider whether it was proper for the chancellor to grant a summary judgment as to all claims.
STANDARD OF REVIEW
1118. In Waggoner v. Williamson, 8 So.3d 147, 152-53 (¶ 11) (Miss.2009), the supreme court succinctly stated the standard of review:
In reviewing a trial court’s grant or denial of summary judgment, the well-established standard of review is de novo. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment motion is only properly granted when no genuine issue of material fact exists. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. The moving party has the burden of demonstrating that no genuine issue of material fact(s) exists, and the non-moving party must be given the benefit of the doubt concerning the existence of a material fact.
(Citations and quotations omitted).
ANALYSIS
¶ 19. Forbes’s claims challenge the very existence of the contracts and St. Martin’s right to recover attorneys’ fees and expenses under the contracts. Forbes contends that this case is not a traditional legal-malpractice case where a client contends that the attorney’s handling of the legal matter fell below the standard of care resulting in the client losing his case. Instead, Forbes’s claims attack the conduct of the attorneys in their performance of the professional-representation contract. Forbes also asserts that the contracts were void, and St. Martin had no right to recover under these contracts.
*1191 ¶ 20. Our usual practice is to examine each claim individually. Since Forbes’s claims overlap, we will address the issues based on the alleged misconduct.

A. Solicitation and Cash Advances

¶ 21. Forbes alleged that the contracts were void because of St. Martin’s improper solicitation[1] and inducement in the form of cash payments.
¶ 22. St. Martin admitted that he had advanced the Forbeses nearly $100,000 during the pendency of the case. St. Martin explained that a significant portion of the cash advances were used to pay for Forbes’s medical expenses; but he admitted that he made cash advances for a Bahamian vacation, a Caribbean cruise, a car, cell phones, and other personal expenses. In fact, in the year before the accident, Forbes’s total gross income was $7,681. In the ten months between August 1998 and June 1999, St. Martin advanced the Forbeses approximately $100,000.
¶ 23. The cash advances were in violation of Rule 1.8(e) of the Mississippi Rules of Professional Conduct, which in part provides:
A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation ... except that:
1. A lawyer may advance court costs and expenses of litigation, including but not limited to reasonable medical expenses necessary to the preparation of the litigation for hearing or trial, the repayment of which may be contingent on the outcome of the matter; and
2. A lawyer representing a client may, in addition to the above, advance the following costs and expenses on behalf of the client, which shall be repaid upon successful conclusion of the matter.
a. Reasonable and necessary medical expenses associated with treatment for the injury giving rise to the litigation or administrative proceeding for which the client seeks legal representation; and
b. Reasonable and necessary living expenses incurred.
The expenses enumerated in paragraph 2 above can only be advanced to a client under dire and necessitous circumstances, and shall be limited to minimal living expenses of minor sums such as those necessary to prevent foreclosure or repossession or for necessary medical treatment. There can be no payment of expenses under paragraph 2 until the expiration of 60 days after the client has signed a contract of employment with counsel. Such payments under paragraph 2 cannot include a promise of future payments, and counsel cannot promise any such payments in any type of communication to the public, and such funds may only be advanced after due diligence and inquiry into the circumstances of the client.
Payments under paragraph 2 shall be limited to $1,500 to any one party by any lawyer ... during the continuation of any litigation unless, upon ex parte application, such further payment has been approved by the Standing Committee on Ethics of the Mississippi Bar. An attorney contemplating such payment must *1192 exercise due diligence to determine whether such party has received any such payments from another attorney during the continuation of the same litigation, and, if so, the total of such payments, without approval of the Standing Committee on Ethics shall not in the aggregate exceed $1,500.
¶ 24. Forbes also contends that the cash advances amounted to undue influence and that the contingency-fee contracts were void as a result. “Any transaction in which an attorney may have taken undue advantage of the client is voidable.” Tyson v. Moore, 613 So.2d 817, 823 (Miss.1992). Such transactions are “presumptively fraudulent,” but the presumption may be overcome following proof of: “(1) the transaction’s fairness, (2) the client’s voluntary entry into the transaction, and (3) the client’s full, independent understanding of the nature of the transactions and his or her rights.” Id. at 823-24 (citations omitted). Furthermore, “an informed and competent client, acting voluntarily, may ratify any such contract....” Id. at 824.
¶ 25. St. Martin wrote a letter to Weathers, dated August 13,1998:
We have an agreement that we will split the fee in this case with fifty (50%) per cent going to your law firm and fifty (50%) per cent coming to our law firm. I will take care of the Forbes’[s] living expenses, etc. We will split the expenses on a 50/50 basis, however, I will advance all this from my law firm.
[[Image here]]
If this is agreeable to you, please sign this fax at the bottom and fax it back to my office. If you agree to the terms, you are authorized to immediately assist in the representation of Forbes.
(Emphasis added). Apparently, Weathers signed and faxed the form back.
¶ 26. Weathers testified that the payments to the clients were improper. The Mississippi Rules of Professional Conduct do not permit a lawyer to “take care of [his client’s] living expenses.” Weathers admitted his knowledge of these payments, and he thereby consented to what would be a violation of the Mississippi Rules of Professional Conduct.
¶ 27. St. Martin offered Mississippi attorney Tim Holleman as an expert witness. Holleman testified that such payments were improper and agreed with Weathers’s opinion that they were not allowed.
¶ 28. Forbes offered Michael Martz as an expert witness. Martz, the former general counsel of the Mississippi Bar, opined that Forbes had not entered into any attorney-client relationship in August 1998 or in October 1998, and that the cash advancements were improper.
¶ 29. Martz’s report stated that St. Martin “violated certain fiduciary duties that [he] owed ... to Mr. Forbes.” Martz opined that the contracts were void because of at least two provisions in the agreements that were contrary to Mississippi law and the rules of professional conduct, and were against public policy. Martz testified that the misrepresentation by St. Martin violated the standard of care and the standard of conduct. St. Martin had a duty to fully and completely explain the terms of the June 1999 contract. He had a duty to research Mississippi law to be fully informed concerning the validity of the terms of the proposed contract. He had a duty to advise Forbes to seek independent legal advice, and his failure to do so violated his fiduciary duty to Forbes. Further, Martz opined that St. Martin had several conflicts of interest and that, by failing to disclose these conflicts, he violated the duties he owed Forbes.
¶ 30. Forbes also claimed that St. Martin violated the Mississippi statutes on *1193 maintenance and champerty. Some may argue that these statutes are archaic and outdated.[2] However, they remain Mississippi law. Mississippi Code Annotated section 97-9-11 (Rev.2006) provides:
It shall be unlawful for any person, firm, partnership, corporation ... either before or after proceedings commenced: (a) to promise, give, or offer, or to conspire or agree to promise, give, or offer, ... any money, bank note, bank check, chose in action, personal services, or any other personal or real property, or any other thing of value, or any other assistance as an inducement to any person to commence or to prosecute further, or for the purpose of assisting such person to commence or prosecute further, any proceeding in any court ..., regardless of jurisdiction; provided, however, this section shall not be construed to prohibit the constitutional right of regular employment of any attorney at law or solicitor in chancery, for either a fixed fee or upon a contingent basis, to represent such person, firm, partnership, corporation, group, organization, or association before any court or administrative agency.
(Emphasis added). Mississippi Code Annotated section 73-3-57 (Rev.2002) provides:
It shall be unlawful for an attorney at law, either before or after action brought, to promise, or give or offer to promise or give, a valuable consideration to any person as an inducement to placing, or in consideration of having placed in his hands, or in the hands of any partnership of which he is a member, a demand of any kind, for the pmpose of bringing suit or making claim against another, or to employ a person to search for and procure clients to be brought to such attorney.
(Emphasis added).
¶ 31. The improper advancement of money to a client is a violation of law and creates a conflict of interest, and there are strong public-policy considerations that protect the public from such unscrupulous practices. “We are sensitive to the concern over leveling the playing field for injured parties.... Our concern is that unregulated lending to clients would generate unseemly bidding wars for cases and inevitably lead to further denigration of our civil justice system.” The Mississippi Bar v. Attorney HH, 671 So.2d 1293, 1298 (Miss.1995) (declining to follow Louisiana State Bar Association v. Edwins, 329 So.2d 437, 445 (La.1976)). The supreme court has also warned:
[Advancing large sums of money to clients may frustrate a party’s willingness or ability to settle and/or cause a conflict of interest for the attorney.... Here, the Tribunal found that the failure to enforce Rule 1.8 would lead to “wholesale violation and disregard of that rule,” and would, “encourage the concept of buying clients.”
Mississippi Bar v. Shaw, 919 So.2d 51, 56 (¶ 9) (Miss.2005) (citation omitted).
¶ 32. In In re G.M., 797 So.2d 931, 935-36 (¶¶ 9-10) (Miss.2001), the supreme court discussed exactly what occurred here and the abuse that would result.
If large sums of money are advanced to maintain the client’s lifestyle, settlement may be frustrated because the parties must consider the amount needed not only to compensate the client, but also to recoup the lifestyle expenses advanced. Considerations such as these may not *1194 allow a client to be objective and reasonable and consider only the merits of the case. Complicating matters is a potential conflict of interest for the attorney, who will consider the recoupment of advanced expenses against what would otherwise be a reasonable settlement for the client.
In choosing an attorney, a client’s judgment should always be based on his confidence in the character and capability of the attorney. Allowing attorneys to pay substantial expenses of clients does not allow for an even playing field among attorneys in getting or keeping clients. Many attorneys cannot afford to pay “lifestyle” expenses on behalf of a client. Rule 1.8(e) provides for the payment of “minor sums.” What constitutes a “minor sum” differs in the legal profession. Here, payment of over $400 a month for one client’s medical insurance premiums, when such payments are to be made for an indefinite period of time, is hardly a “minor sum,” particularly in the absence of any recurring medical expense or required medical procedure. There is a great potential for abuse and overuse in paying expenses on behalf of a client. Indeed, many arguments can be made that almost any expense is “reasonable and necessary.”
¶ 33. The Forbeses presented evidence that there were a number of lawyers vying for the opportunity to represent them in their personal-injury action. St. Martin used the cash advances and the promise of future cash advances to obtain the representation. Weathers’s file indicated that lawyers from all over the country were “hustling” the cases. Weathers testified that there was a “feeding frenzy” to get these cases.
¶ 34. There is clear and abundant Mississippi authority that St. Martin’s improper advance of almost $100,000 to the Forbeses was conduct that would void the contingency-fee contract. In Smith v. Simon, 224 So.2d 565, 566 (Miss.1969), the court held “[tjhere is no doubt that the courts have the duty and the power to declare void and unenforceable contracts made in violation of law or in contravention of the public policy of the state.... But not every contract with some illegal aspect is void and unenforceable.” Under Mississippi law, the improper cash advances appear to be a sufficient reason to void St. Martin’s contracts.
¶ 35. St. Martin argues that he was not a licensed Mississippi lawyer and that his actions were permitted in Louisiana, where he was licensed. This is an interesting argument, but it fails.
¶ 36. The first reason it fails is that Weathers was aware, through the August 13, 1998 letter from St. Martin, that St. Martin was planning to “take care of the Forbes[es]’[s] living expenses.” With that knowledge, Weathers, as a Mississippi lawyer, knew or should have known that his co-counsel’s payment was in violation of the Mississippi Rules of Professional Conduct. The fact that St. Martin may escape disciplinary action because he was not licensed to practice law in Mississippi, and he had not applied for permission to practice law pro hac vice in this case, does not conclusively establish that there was no clear and significant violation of Mississippi law and the Mississippi Rules of Professional Conduct, which would void the contingency-fee contract. Weathers’s knowledge would be sufficient to void the contract.
¶ 37. The second reason it fails is that there is no doubt that, if a Mississippi attorney had advanced this sum of money to a client, the Mississippi lawyer would be subject to discipline. Such attorney would most likely lose his license to practice law. *1195 Such improper action may not be permitted of a Louisiana lawyer who enters a contingent fee contract with a Mississippi citizen, to perform legal services on a claim that arose in the State of Mississippi, and that would be litigated in the State of Mississippi. The consequence should be the same.
¶ 88. Accordingly, we find that the evidence of cash advances is sufficient to establish that there is a genuine issue in dispute as to a material fact and that St. Martin and the St. Martin firm are not entitled to a judgment as a matter of law. As a result, we reverse and remand this issue for further proceedings.
B. St. Martin’s Status — Practicing Law Without a License
¶ 89. Forbes also asserts that the contingency-fee contracts were void because St. Martin engaged in the unauthorized practice of law in the State of Mississippi. The question of whether the unauthorized practice of law voids a contract for legal services appears to be a matter of first impression in Mississippi; however, other jurisdictions have considered the issue.
¶ 40. In McRae v. Sawyer) 473 So.2d 1006, 1007 (Ala.1985), a Mississippi attorney entered into a contract to represent two Alabama residents who had sustained injuries in Alabama following a collision with a tractor-trailer truck. The attorney was not licensed in Alabama. Id. Therefore, he associated an Alabama law firm. Id. He then filed a lawsuit in Alabama on behalf of his clients. Id. His clients later dismissed him as their attorney, retained new counsel, and settled their case. Id. The Mississippi attorney filed a motion for an attorney’s lien on the settlement proceeds. Id. The trial court awarded the attorney a lien, but he appealed from the lien judgment arguing that he was entitled to a greater percentage of the settlement proceeds. Id.
¶ 41. The Alabama Supreme Court held that the attorney’s “failure to comply with the licensing statutes of [Alabama] rendered] his contracts with [the Alabama residents] unenforceable.” Id. at 1008. Consequently, he could not pursue a claim for recovery of compensation under the contracts. Id. In support of its holding, the court pointed to previous decisions where it had held that professionals in other occupations, such as engineering, real estate, and construction, could not enforce their contracts for services because they had failed to comply with Alabama licensing statutes. Id. The court also noted that “if the purpose of a licensing statute is the regulation of the business licensed and not merely the collection of revenue, a person not licensed cannot enforce a contract for services rendered within the scope of the regulated business.” Id. at 1009 (quoting Tucker v. Walker, 293 Ala. 589, 308 So.2d 245, 247 (1975)).
¶ 42. Mississippi has licensing statutes that preclude an unlicensed professional from recovering a fee or enforcing a contract for services. See Miss. Code Ann. § 73-13-39 (Rev.2012) (engineers); Miss. Code Ann. § 73-35-31 (Rev.2012) (real-estate brokers); Miss.Code Ann. § 73-59-9 (Rev.2012) (residential builders). Mississippi’s unauthorized-practice-of-law statute, Mississippi Code Annotated section 73-3-55 (Rev.2012), provides:
It shall be unlawful for any person to engage in the practice of law in this state who has not been licensed according to law. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished in accordance with the provisions of [Mississippi Code Annotated] section 97-23- *1196 43 [ (Rev.2006) ]. Any person who shall for fee or reward or promise, directly or indirectly, write or dictate any paper or instrument of writing, to be filed in any cause or proceeding pending, or to be instituted in any court in this state, or give any counsel or advice therein, or who shall write or dictate any bill of sale, deed of conveyance, deed of trust, mortgage, contract, or last will and testament, or shall make or certify to any abstract of title or real estate other than his own or in which he may own an interest, shall be held to be engaged in the practice of law.
The supreme court has stated that the activities listed in section 73-3-55, as constituting the practice of law, “are not all-exclusive nor all-inclusive,” because this list “does not encroach on the constitutional power of the judiciary to determine that other acts” also fall under the definition of the practice of law. Darby v. Miss. State Bar, 185 So.2d 684, 687-88 (Miss.1966).
¶43. The Mississippi Supreme Court reaffirmed Darby’s definition of the practice of law in In re Williamson, 838 So.2d 226, 234 (¶ 17) (Miss.2002) (citing Darby v. Miss. State Bar, 185 So.2d 684, 687 (Miss.1966)). The court found that “[t]he ‘practice of law' has been defined to be as little as advising a person of his legal rights.” Id. There, like this case, the court considered when an out-of-state attorney will be deemed to have “ma[d]e an appearance in a Mississippi court.” Id. at 235 (¶ 22).
¶ 44. Michael J. Miller was a lawyer licensed in Maryland, Virginia, and the District of Columbia, but not in Mississippi. Id. at 229-30 (¶ 2). Miller advertised his services in Mississippi and regularly associated Ed Williamson, a Mississippi attorney, to file lawsuits in Mississippi. Id. Miller’s name was listed on the pleadings, but he had not complied with Mississippi Rule of Appellate Procedure 46 and obtained admission pro hac vice. Id. at 230-31 (¶ 3).
¶ 45. The defendant moved to strike the pleadings due to Miller’s failure to follow the rules. Id. at 230 (¶ 3). The circuit court denied the motion for pro hac vice admission, found both Miller and Williamson in contempt, and imposed a cost bill. Id. at 233 (¶ 12). The court ruled:
M.R.A.P. 46(b)(6)[3] also prohibits a foreign attorney from appearing pro hac vice if the foreign attorney has engaged in the “general practice of law” in this state without being properly admitted and licensed to practice law in this state. M.R.A.P. 46(b)(6)(i). For purposes of the rule, the “general practice of law” is defined as “appearances as pro hac vice before any court or administrative agency of this state on more than five (5) occasions in any 12 month period.” M.R.A.P. 46(b)(6)(ii). The “practice of law’’ has been defined to be as little as advising a person of his legal rights or exercising discretion in drafting documents:
The practice of law includes drafting or selection of documents, the giving of advice in regard to them, and the using of an informed or trained discretion in the drafting of documents to meet the needs of the person being served. So any exercise of intelligent choice in advising another of his legal rights and duties brings the activity within the practice of the legal profession.
Darby v. Miss. State Bd. of Bar Admissions, 185 So.2d 684, 687 (Miss.1966) (citation omitted). *1197 William,son, 838 So.2d at 234 (¶ 17) (emphasis added).
¶ 46. The court also considered whether the foreign attorney had engaged in the unauthorized practice of law. The court held:
Even excluding the fact that Miller’s name and address appeared on the pleadings, we find that Miller’s actions constituted practicing law in Mississippi. All of the cases listed in the affidavits, as well as the case sub judice, originated from Miller’s office and were “his” cases. The cases came directly to Miller’s office by way of a 1-800 number advertised in Mississippi. Miller reviewed the cases with his staff of two nurses, a doctor, a surgeon, and six lawyers to determine whether the claim was meritorious. Once a contractual relationship with the client was established, Williamson filed a complaint in the appropriate Mississippi court. Miller conceded that he and Williamson jointly worked on all of the cases and that he normally did not put his name on a pleading unless he had decided to enter an appearance.
[[Image here]]
Miller and Williamson contend that the only appropriate authority for addressing a charge that Miller engaged in the unauthorized practice of law is the Mississippi Bar and not the courts. They further argue that Miller was serving only as a means of determining whether any of the claims had merit, that he merely “screened the case and provided Williamson with technical advice on the medical aspects of it.” If the claims had merit, Williamson prepared and filed the pleadings. It was only when Miller was allowed to appear pro hac vice that he deposed experts. They also contend that numerous lawyers do this type of activity regularly without being accused of engaging in the unauthorized practice of law.
In Darby, a chancery court clerk was found guilty of engaging in the unauthorized practice of law when she prepared deeds, deeds of trust, notes, bills of sale, and real property title certificates. [Darby,] 185 So.2d at 687. The Kansas Supreme Court has held that performing legal services in any legal proceeding through the various stages of litigation constitutes the practice of law:
The practice of law is the doing or performing of services in a court of justice, in any matter depending therein, throughout its various stages, and in conformity to the adopted rules of procedure. But in a larger sense it includes legal advice and counsel, and the preparation of legal instruments and contracts by which legal rights are secured, although such matter may or may not be depending in a court.

One who confers with clients, advises them as to their legal rights, and then takes the business to an attorney and arranges with him to look after it in court is engaged in the practice of law.

State ex rel. Stephan v. Williams, 246 Kan. 681, 793 P.2d 234, 240 (1990) (citations omitted).
Miller clearly conferred with clients, advised them as to their legal rights and then engaged the services of another attorney to litigate the claim. He procured each and every client through commercials on the television. Once their claims were investigated by Miller and his office staff, he contacted Williamson. Miller characterized these cases as “his” cases. He continued to advise Williamson on the case and, in the case sub judice, attended a deposition. Miller also had a financial inter *1198 est in the outcome of these cases. Although the Court has held that although “the practice of law does not necessarily depend on whether one charges or receives a fee for services performed, the element of compensation may be a factor in determining whether the specified conduct constitutes the practice of law. ” Darby, 185 So.2d at 687. Miller’s name appeared on the complaint and other pleadings. The combination of all of these factors supports a finding that Miller had engaged in the unauthorized practice of law.
We therefore affirm the circuit court’s denial of the motion for admission pro hae vice, and we refer this matter to the Mississippi Bar for further proceedings.
Williamson, 838 So.2d at 285-37 (¶¶23-28).
¶ 47. We also note the California Supreme Court decision in Birbrower, Mon-talbano, Condon & Frank, P.C. v. Superior Court, 17 Cal.4th 119, 70 Cal.Rptr.2d 304, 949 P.2d 1 (1998) (superseded by Cal.Civ.Proc.Code § 1282.4 (providing an arbitration exception to the unauthorized practice rule)). There, a California corporation brought a legal-malpractice suit against the New York law firm that had represented it in a dispute which eventually settled prior to the start of an arbitration. Id. at 3-4. The law firm brought a counterclaim for its unpaid legal fees. Id. at 4. The California Supreme Court considered whether the out-of-state law firm could recover its legal fees for services it performed in California, because the services constituted the unauthorized practice of law in California. Id. at 3. The court concluded that the law firm’s representation of a client in California constituted the unauthorized practice of law. Id. at 7. The out-of-state law firm argued that there was a difference between private arbitrations and legal proceedings, and there should be an exception to the rule regarding the unauthorized practice of law. Id. at 8. The court determined that the law firm was “barred from recovering compensation for services rendered in another state where the attorney was not admitted to the bar.” Id. at 10.
¶ 48. There was absolutely no connection between Forbes, his accident, his injuries, or his damages and the State of Louisiana. St. Martin traveled from Louisiana to Alabama and offered his legal services to Forbes. Forbes was a Mississippi resident who was injured in Mississippi, and the litigation could only be filed in Mississippi and decided based on Mississippi law. Likewise, in his supplemental brief, St. Martin admits that a conflict-of-laws analysis would allow Mississippi law to be applied to this contract. Forbes’s claims could only be pursued in the courts of the State of Mississippi; venue was not proper in Louisiana. Yet St. Martin offered to represent Lisa and Forbes in a legal matter that St. Martin knew, or should have known, he could not perform based on his law license.
¶49. On June 10, 1999, St. Martin wrote a letter to Weathers about his meeting with Forbes. The letter reads:
I have discussed in detail the present position that James Forbes’[s] lawsuit is in. I have explained the apportionment of the fault to him. I have explained the tax consequences on punitive damages. I have explained what items he can recover as a result of his burns. I have explained Premium Tank Lines insurance carrier’s position on their pollution exclusion. I have explained to him that there was $8.75 Million on behalf of Morrison to settle all the claims against them. I have explained that out of the $8.75 Million, Five Million would go to settle his claim. I also explained to him that Morrison could be liable for fifty *1199 (50%) per cent of the total damages and I have instructed him that we would reject this in writing if it was his desire to do that.
I am having him sign this rejection letter because he has told me that he wants to reject this offer. I have dictated this letter in his presence and his wife’s presence and they have instructed me to reject this offer.
With best regards, I remain
Sincerely,
/s/ L. St. Martin Louis J. St. Martin
I (WE) REJECT THE OFFER AS ABOVE STATED
/s/ James Forbes_/s/ Lisa Forbes James Forbes James
Forbes
¶ 50. This letter indicates that St. Martin provided legal advice to Lisa and Forbes as to Mississippi law. We look at the statements made in the letter:
a. “I have discussed, in detail the present position that James Forbes’[s] lawsuit is in.” This statement required St. Martin to have knowledge of the claims filed and the Mississippi law that supported each claim. It also required St. Martin to have the ability to analyze the facts presented and the potential outcome of the Mississippi litigation.
b. “I have explained the apportionment of the fault to him.” This explanation required St. Martin to understand, explain, and advise the Forbeses as to Mississippi law on apportionment of fault.
c. “I have explained, what items he can recover as a residt of his bums.” This explanation required St. Martin to understand, explain, and advise the Forbeses on how Mississippi law applied to the claims and damages.
d. “I have explained Premium Tank Lines insurance carrier’s position on their pollution exclusion.” This explanation required advice on how Mississippi courts would interpret a Mississippi insurance policy.
¶ 51. This letter is sufficient to indicate that there were indeed facts in dispute to indicate that St. Martin practiced law in Mississippi.
¶ 52. St. Martin and Weathers made a decision that St. Martin would not be properly admitted to practice pro hac vice under Rule 46. St. Martin did not file an entry of appearance in Forbes’s case or sign any pleadings. Weathers did include St. Martin’s name as “of counsel” on the complaint. In a letter dated August 16, 1998, Weathers informed St. Martin that he would list him as “of counsel” on the complaint. However, in a letter dated October 28,1998, to opposing counsel, Weathers explained that St. Martin “will not be participating as an attorney in this matter[;] he will not be enjoying ‘Of Counsel’ status, and has no intention, at this time, of seeking admission to the Mississippi bar on a pro hac vice basis.” Weathers then instructed opposing counsel to remove St. Martin from the service list. Nevertheless, St. Martin attended depositions; however, he testified that he did not participate in the depositions. Based on these facts and St. Martin’s June 10, 1999 letter, there appears to be evidence that St. Martin appeared before the Mississippi courts for at least two months and gave legal advice to the Forbeses.
¶ 53. The effect of an admission pro hac vice is that St. Martin would consent to the jurisdiction of Mississippi courts, would be required to “comply with the standards of professional conduct required of members of the Mississippi Bar” and would “be subject to the disciplinary jurisdiction of the courts of this state, of the disciplinary tribunals of the Mississippi Bar.” M.R.A.P. *1200 46(b)(3). If St. Martin had been admitted pro hac vice, his actions in giving the Forbeses’s cash advances would have been clearly prohibited, and he would have been subject to discipline.
¶ 54. Further, St. Martin may have had issues with his Louisiana bar license. In Dinet v. Gavagnie, 948 So.2d 1281, 1284-85 (¶¶ 9-10) (Miss.2007), the court ruled:
Rule 5.5(a) of the Louisiana Rules of Professional Conduct states that “[a] lawyer shall not practice law in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.” The Supreme Court of Louisiana disbarred two attorneys for unauthorized practice of law during their employment in North Carolina before either person had passed the Louisiana or North Carolina bar exam. In addition to other violations, the Disciplinary Board found that the defendants violated Rule 5.5 by engaging in the unauthorized practice of law in North Carolina.
The Court stated:
We further find that the record convincingly demonstrates that respondents’ failure to disclose their employment prevented this court from obtaining access to information which had a significant bearing on their character and fitness-namely, whether they engaged in the unauthorized practice of law while working in the law office of Mr. Locklear. The evidence suggests an investigation would have clearly revealed both Mr. and Mrs. Stamps engaged in the unauthorized practice of law in North Carolina.
We find that Shields violated Rule 5.5(a) when he engaged in the unauthorized practice of law in this State. We remand this issue to the trial court with instructions to notify the Louisiana State Bar of this unauthorized activity and for imposition of such other sanctions as the trial court deems proper due to the violations of Miss. R. Civ. P. 11 and Miss. R.App. P. 46.
(citations omitted).
¶ 55. Accordingly, we find that the that there is a genuine issue of material fact in dispute as to whether St. Martin and the St. Martin firm were engaged in the unauthorized practice of law in the representation of the Forbeses. Therefore, they are not entitled to a judgment as a matter of law. We reverse and remand this issue for further proceedings.

C. Claims for Legal Malpractice and Breach Fiduciary Duty

¶ 56. Forbes’s claims for legal malpractice and breach of fiduciary duty are intertwined. In Wilboum v. Stennett, Wilkinson & Ward, 687 So.2d 1205, 1215 (Miss.1996) (citations omitted), the supreme court held:
To recover in a legal malpractice case in this state, it is incumbent upon the plaintiff to prove by a preponderance of evidence the following: (1) Existence of a lawyer-client relationship; (2) Negligence on the part of the lawyer in handling his client’s affairs entrusted to him; and (3) Proximate cause of the injury. As to the second factor, a lawyer owes his client the duty to exercise the knowledge, skill, and ability ordinarily possessed and exercised by the members of the legal profession similarly situated. Failure to do so constitutes negligent conduct on the part of the lawyer. As to the third essential ingredient, the plaintiff must show that, but for their attorney’s negligence, he would have been successful in the prosecution or defense of the underlying action.
This Court has stated that legal malpractice may be a violation of the standard of care of exercising the *1201 knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession similarly situated, or the breach of a fiduciary duty.
This Court has recognized each lawyer owes his client duties falling into three broad categories: (a) the duty of care; (b) a duty of loyalty; and (c) duties provided by contract. The duty of loyalty, or sometimes, the duty of fidelity speaks to the fiduciary nature of the lawyer’s duties to his client, of confidentiality and of candor and disclosure.
¶ 57. In Williamson v. Edmonds, 880 So.2d 310, 312-13 (¶ 1) (Miss.2004), Lisa and Larry Edmonds brought a declaratory judgment action against their attorney, Ed Williamson, and asserted claims for breach of the duty of care, breach of contract, and breach of the duty of loyalty. The court held:
Mere joint representation cannot act as shield against an attorney malpractice action. Although there are no prior Mississippi cases which directly speak to the issues presented here, we are guided by the Mississippi Rules of Evidence, the Mississippi Rules of Professional Conduct, and the wisdom of our court in other states which have more squarely dealt with the issue here presented.
Id. at 319 (¶24) (emphasis added). The court then used the Mississippi Rules of Professional Conduct to determine what duty Williamson owed to his clients. Id. at 319-20 (¶¶ 24, 27-28). See also Waggoner, 8 So.3d at 160 (¶ 39)(Kitchens, J., dissenting) (arguing majority opinion “rests centrally on the Waggoners’ allegation that their attorneys violated the Rules of Professional Conduct”); Hartford Acc. & Indem. Co. v. Foster, 528 So.2d 255, 267-70 (Miss.1988) (looking to Mississippi Rules of Professional Conduct to determine duty owed by a defense attorney employed by an insurance carrier to represent the insured). But see Pierce v. Cook, 992 So.2d 612, 625-26 (¶42) (Miss.2008) (“Rules are designed to provide guidance to lawyers .... They are not designed to be a basis for civil liability.”)
¶ 58. In Singleton v. Stegall, 580 So.2d 1242, 1244-45 (Miss.1991), the court held:
Today a lawyer owes his client duties falling into three broad categories: (a) the duty of care, (b) a duty of loyalty, and (c) duties provided by contract. First, each lawyer, by virtue of the positive, substantive law of this state, has a duty of care consistent with the level of expertise the lawyer holds himself out as possessing and consistent with the circumstances of the case. This duty is non-delegable. It is owing to each client he or she undertakes to serve, and in that regard the client has a correlative right. The lawyer’s duty of care imports not only skill or expertise but diligence as well. Both our rules of professional conduct, and our positive law charge that a lawyer shall act with reasonable diligence and promptness in representing a client. One of the clearer cases where a lawyer may breach his duty of diligence occurs when, through neglect, he allows the statute of limitations to expire so that the client’s claim is barred.
Each lawyer owes each client a second duty, not wholly separable from the duty of care but sufficiently distinct that we afford it its own label, viz. the duty of loyalty, or, sometimes, fidelity. We speak here of the fiduciary nature of the lawyer’s duties to his client, of confidentiality and of candor and disclosure. Third, a lawyer owes any duties created by his contract with his client.
(Citations and footnotes omitted). In Foster, the supreme court ruled:
According to Mallen and Levit, Legal Malpractice § 1 (2d ed.1981):
*1202 Some courts seem to distinguish a breach of the fiduciary obligations from legal malpractice. The prevailing and more reasonable view, however, is that legal malpractice encompasses any professional misconduct whether attributable to a breach of the standard of care or of the fiduciary obligations. In recognition of the dual bases of an attorney’s liability, some courts have referred to the fiduciary obligations as setting forth a standard of “conduct.” Thus, under the theoretical approach[,] legal malpractice may be defined as “a breach by an attorney of either the standard of care or of the standard of conduct.”
Thus, legal malpractice may be a violation of the standard of care of exercising the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession similarly situated, or the breach of a fiduciary duty. The declaration here charges a fiduciary violation as the basis for this malpractice action.
To recover under the negligence theory of legal malpractice, the client must prove the existence of an attorney-client relationship, the acts constituting negligence, that the negligence proximately caused the injury, and the fact and extent of the injury. However, the legal malpractice alleged in this case is a violation of the standard of conduct, not breach of the standard of care. The elements of this cause of action are the same as other legal malpractice actions except, instead of proving negligence, the plaintiff must prove a violation of the attorney’s fiduciary duty.
Foster, 528 So.2d at 284-85 (emphasis added and citations omitted).
¶ 59. In Waggoner, the Mississippi Supreme Court considered a similar case. Barthel and Jacqueline Waggoner brought a lawsuit for breach of fiduciary duty, breach of contract, and negligent misrepresentation against attorneys Ed Williamson and Michael J. Miller. Waggoner, 8 So.3d at 149 (¶ 1). The Waggoners’ claims sought the disgorgement of attorneys’ fees, compensatory and punitive damages, rescission of the contract, and an award of attorneys’ fees to Williamson and Miller based upon quantum meruit. Id. The trial court granted a partial summary judgment in favor of Williamson and Miller, and the supreme court granted the Waggoners’ interlocutory appeal. Id.
¶ 60. The Waggoners hired Williamson to represent them in diet-drug litigation. Id. at (¶ 2). Williamson also represented more than thirty other plaintiffs in this litigation. Id. Williamson associated Miller and Ed Blackmon to assist in the litigation and did not disclose this to the Waggoners. Id. at 150 (¶ 3). Miller represented other plaintiffs in similar litigation in Virginia and Washington, D.C. Miller negotiated a settlement of all claims. Id. at (¶¶ 3-4). Two months later, the Waggoners learned of the settlement and were told to meet Williamson and the local airport. Id. at (¶ 5). They met with Williamson and quickly signed the settlement statement without an adequate opportunity to review it and question Williamson. Id. at 151.
¶ 61. The Waggoners alleged that they later became aware of wrongdoing by Williamson and Miller with respect to their representation and settlement of claims and disbursement of settlement proceeds. Id. at (¶ 7). The trial court found that the Waggoners “knowingly agreed” to the settlement statement and granted a partial summary judgment that they agreed to the attorney’s fees and related costs. Id. at 153 (¶ 12). The supreme court found genuine issues of material fact present as to the claims for breach of contract, negli *1203 gent misrepresentation, and breach of fiduciary duty. Id. at 154 (¶ 14). The court reversed the grant of partial summary judgment and ruled:
As such, summary judgment was improper in the case sub judice. The record establishes that there are genuine issues of material facts in support of the Waggoners’ claim of breach of fiduciary duty. “Without doubt, a lawyer has a duty to inform his client of all matters of reasonable importance related to the representation or arising therefrom.” Tyson v. Moore, 613 So.2d 817, 827 (Miss.1992) (citation omitted). The Waggoners argue that ‘Williamson’s and Miller’s secretive allocation of aggregate settlement funds themselves among the thirty-one (31) Mississippi clients and the fourteen (14) Washington, D.C. and Virginia clients and the inherent conflicts of interest associated therewith is the clearest example of the breach of common law duty of loyalty presented by the instant case.” In Tyson, this Court stated:
The duty of loyalty is fiduciary in nature. In the present context its breach may take one of two forms. The first involves situations in which the attorney obtains an unfair personal advantage, such as acquiring property from a client; the second involves situations in which the attorney or other clients have interests adverse to the client in question. We have recently defined the lawyer’s duty of loyalty to include a duty to:
safeguard the client’s confidences and property, avoid conflicting interests that might impair the representation, and not employ adversely to the client powers conferred by the client-lawyer relationship.
Id. at 823 (quoting Singleton v. Stegall, 580 So.2d 1242,1245 (Miss.1991)).
Waggoner, 8 So.3d at 154-55 (¶ 15).
¶ 62. Forbes’s claim for legal malpractice and breach of fiduciary duty will turn on whether St. Martin violated the “standard of conduct.” The chancellor ruled, in a twenty-nine page opinion, that there was no genuine issue of a material fact and that St. Martin was entitled to a judgment as a matter of law. We move to the facts.
¶ 63. Forbes was severely injured by an explosion on August 9, 1998. He was airlifted to Mobile, Alabama, for treatment in the hospital’s burn unit. As part of his treatment, he was chemically sedated and placed in a “drug-induced coma.”

1. The First Contingency-Fee Contract Signed on August 11, 1998, Was Void

¶64. On August 11, 1998, St. Martin discussed potential legal representation of the Forbeses with Lisa, while Forbes was in a coma. St. Martin presented Lisa with a contingent-fee contract for her to sign. Forbes did not sign the agreement, agree to its terms, or know of its existence.
¶ 65. St. Martin and Weathers immediately began working on the case. When the complaint was filed, St. Martin and Weathers represented Forbes without Forbes’s knowledge or consent. Neither St. Martin nor Weathers had a contract (verbal or otherwise) with Forbes that gave them authority to undertake the commencement of the litigation.
¶ 66. In October 1998, Forbes was brought out of the coma, but he remained in the intensive care unit. In an October 8, 1998 letter, St. Martin acknowledged that Forbes was unable to mentally or physically care for himself and that he remained in intensive care. The same day, Weathers researched the issue of quantum merit and reviewed cases on the subject of *1204 what happens when a lawyer does not have a signed contingent-fee contract. Weathers provided the results of his research with St. Martin. Weathers and St. Martin’s efforts in this research were for their own self-interest and did not advance their representation of Forbes.
¶ 67. St. Martin visited Forbes in the hospital on October 12,1998. Based on St. Martin’s version of the events, the chancellor found there existed a valid ratified contract for representation. However, there was other evidence that directly contradicted St. Martin’s version. Lisa testified that St. Martin never showed the August 11, 1998 contract to Forbes and never read it to him, and that Forbes never saw it.
¶ 68. There appears to be a genuine issue of a material fact in dispute as to whether Forbes ratified the August 11, 1998 contingency-fee contract. Forbes and Lisa testified that he was never shown the contract, that it was never read to him, and that he never agreed to its terms in any way whatsoever. St. Martin testified that he read it to Forbes, and that Forbes saw it, understood it, and agreed to it.
¶ 69. There were also genuine issues of material facts in dispute as to Forbes’s competency at this time. Forbes testified that in October 1998 he was heavily medicated. Lisa testified that he was on morphine. St. Martin wrote a letter, dated October 8, 1998, that said he was of the opinion that Forbes was not mentally or physically capable of taking care of himself. After performing a psychiatric evaluation on June 24, 1999, Dr. Donald C. Guild noted that when Forbes awoke from his coma he “was on a considerable amount of medication.”
¶ 70. Summary judgment should be reversed where one party swears to one versión of the matter in issue and another says the opposite. Lawrence v. Lawrence, 956 So.2d 251, 256 (Miss.Ct.App.2006). We find that summary judgment on the question of whether Forbes ratified the contract on October 12 was not appropriate. Accordingly, we reverse and remand this issue for further proceedings.

2. The Second Contingency-Fee Contract Signed on June 10, 1999, Was Void

¶ 71. On June 10, 1999, Lisa and Forbes traveled to St. Martin’s office in Louisiana. After their discussions with St. Martin, they rejected a settlement offer of $5,000,000. St. Martin also asked the Forbeses to sign another contingency-fee contract. This contingency-fee contract contained material differences from the first contingency-fee contract, and increased the amount of compensation to be paid to St. Martin.[4]
¶ 72. Forbes testified that he was still taking numerous narcotic medications and that he was under the influence of these medications at the time he was presented with the June 10, 1999 contract. Dr. Guild’s report identified the medications Forbes was taking in June of 1999: “He is currently on ... Prozac[,] ... Risperdal [, and] ... Xanax....”
¶ 73. St. Martin testified:
Q. Why is it, then, that you became of the opinion ... that you should have Mr. Forbes execute a written contract on a contingency-fee basis on the same day you have him reject a $5 million settlement offer?
A. Because I think it jogged my memory that we didn’t have one.
*1205 Q. But heretofore, you have been of the opinion that you didn’t need one.
A. I didn’t need one to do what we were doing, no....
A. At some point, I knew I’d need one.
Q. And at one point, did you think that you would have to have one?
A. When we started talking about settlement, I, once again, was concerned. I figured we’d be put before a judge ... [where] we would have to present our contract....
St. Martin’s testimony disputes the chancellor’s decision that Forbes ratified the August 1998 contract by the meeting in October 1998. St. Martin takes the position that no written contract was necessary, but then once settlement discussions began in earnest, he realized that he needed a contract to secure a contingent fee as opposed to an hourly or quantum merit fee.
¶ 74. Lisa testified:
Q. And so is the day when you signed a contract, that James and you signed another contract?
A. I want to say yes.
Q. This has been previously marked in James[’s] deposition.... Is that the contract you’re talking about?
A. Yes, this is the contract.
Q. ... And tell me what you remember about that discussion that you had.
A. Who, me and James or—
Q. First of all, you and Mr. St. Martin and James.
A. Well, at first we thought it was a power of attorney he wanted us to sign, so we argued a little bit over that.
Q. Who did?
A. Me and [St. Martin], because he got mad because I mentioned something about power of attorney. That’s when he threw up all his checking and stuff and said I’m a millionaire. I don’t need to take power of attorney over, I was like, okay, because [if] it was power of attorney we wasn’t going to sign it.
Q. Some discussion came up about an hourly rate. What do you remember about that?
A. All I remember, Mr. Louis mentioned something about we can either go through an hourly rate, which is going to cost more because it was hourly, or we could just have a percentage. That’s all that was mentioned about the hourly rate.
¶ 75. This testimony indicates the presence of a genuine issue of a material fact as to the June 10, 1999 contract. St. Martin testified that he simply gave them a new but different contract and told them to sign it without explanation. St. Martin seemed to have not read the contract because he was not aware that the fee provisions were different. They signed it. But Lisa testified that they had a heated discussion that led to St. Martin getting mad at them, throwing his checkbook, and giving them advice against choosing an hourly rate because it would be more expensive. Forbes testified that he was on narcotic medication, that he was not clear headed, and that if they had been told what the actual hourly fee was, he and his wife would not have signed the contract.
¶ 76. Forbes claims that the contract should be void for a number of reasons. He claims that St. Martin breached his fiduciary duty when he stated that it would be more expensive for him to represent them on an hourly fee. St. Martin’s hourly efforts were not recorded. However, if we accept St. Martin’s position in the mo *1206 tion for summary judgment, there was not evidence that St. Martin spent substantial time on the case. He did not prepare or sign any pleadings or motions. He did not negotiate with the insurance carriers. He did not do any legal research. Instead, all of the substantive legal work was done by Weathers. Weathers’s firm’s billing records indicated that they worked 755.40 hours on Forbes’s case between 1998 and 2000. St. Martin’s fee was $4,590,000.
¶ 77. Forbes also argues that it stretches the bounds of credibility that an hourly fee would have exceeded or been more expensive than a contingent fee. Considering that all the liable parties had agreed to tender the limits of their substantial commercial policies in December 1998, that there was a $5,000,000 offer pending in June 1999, that the matter was set for mediation the following month in July, and that the matter was set for trial in August 1999, Forbes argues that the settlement offer was going to increase. He claims that St. Martin’s statement that an hourly fee would be more expensive was false and would only advance his self-interest.
¶ 78. The supreme court has spoken on attorney contingent-fee contracts:
A contract for a contingent fee must be made in good faith, without suppression of facts ... and without undue influence of any sort or degree.... If the contract is shown to have been obtained by fraud, mistake or undue influence[,] ... if the attorney suppresses the facts[,] ... or if he uses any unfairness in securing it, the contract will be held invalid.
Fitzpatrick v. Kellner, 187 Miss. 843, 850-51, 193 So. 911, 912-13 (1940); see also Ownby v. Prisock, 243 Miss. 203, 207-08, 138 So.2d 279, 280 (1962). To decide whether there has been any deception, misleading, fraud, or suppression of information, a court must apply an objective standard. The client does not have to prove that he was actually misled or deceived. If, objectively, the contract is deceptive or misleading; the attorney’s actions were deceptive; or the attorney suppressed facts, withheld information or took any undue advantage, then the contract is invalidated.
Breach of the duty of loyalty ... is characterized as “constructive fraud” because proof of intent is irrelevant; thus, the elements of actual fraud, duress, or coercion do not enter into the analysis.... The objective standard rests on this rationale: Because a breach of loyalty injures both the client’s interests and the legal profession’s integrity, the gravity of the harm cannot be cured by good faith.
Any transaction in which an attorney may have taken undue advantage of the client is voidable. The transaction is ... “presumptively fraudulent.”
Tyson v. Moore, 613 So.2d 817, 823 (Miss.1992) (citations omitted).

3. Other Contract Provisions Were Void

¶ 79. Both of the contracts, based on the different terms, also demonstrate that St. Martin was not entitled to a summary judgment. Two of the five paragraphs of both agreements are invalid and unenforceable. St. Martin had absolutely no right to limit his clients’ ability to settle their lawsuit or ability to terminate St. Martin as their attorney.
¶ 80. These contractual provisions are invalid and unenforceable. They are false and misleading statements regarding the attorney-client relationship. The first invalid provision reads: “My(Our) attorney is to have the exclusive handling of this claim and I(we) will cooperate with him. No compromise can or will be made without my(our) signature(s) and without the *1207 approval and signature of my(our) attorney....” The contracts reserved to St. Martin the absolute control over the settlement of the case and prohibited Forbes from settling without his approval.
¶ 81. Holleman, St. Martin’s expert, agreed that during the formation and negotiation of a contingent-fee contract, an attorney owes the client the duties of honesty, good faith, and fair dealing. Also, the contract must be free from any misrepresentation. The attorney cannot withhold any information, and he cannot use any deception. Dane Ciolino, St. Martin’s other legal expert, testified that a lawyer cannot misrepresent anything in negotiating a contingent fee contract. Holleman testified that, had he been advising Forbes, he would have had him mark out that particular clause.
¶ 82. The second invalid provision tried to limit the clients’ right to terminate their attorney. This provision reads:
My(Our) attorney may be fired only for negligent handling of my(our) claim or failure to pursue my(our) claim with ordinary legal diligence. In all other cases, my(our) attorney is entitled to a full fee as outlined above for any settlement I(we) receive in the above matter, even though other counsel may be consulted or hired. I(We) have signed this agreement only after reading and explanation by the abovementioned attorney.
As to this provision, Holleman testified:
Q. Okay. And looking at the contract where it talks about you can’t fire the lawyer for any reason other than his negligent handling of the case and if you do fire for any other reason, you owe them the whole fee, would have told them to mark that out?
A. I would say, mark it out.
¶ 88. In Poole v. Gwin, Lewis & Punches, LLP., 792 So.2d 987, 989-90 (¶ 9) (Miss.2001), the supreme court held:
It is a settled rule that because of the special relationship of trust and confidence between attorney and client, the client may terminate the relationship at any time, with or without cause. A client’s discharge of his attorney is not a breach of contract because “it is a basic term of the contract, implied by law into it by reason of the special relationship between the contracting parties, that the client may terminate the contract at will.”
¶ 84. An attorney simply cannot include an anti-settlement or anti-termination clause in a contingent-fee contract. Such clauses are misleading and unenforceable. The supreme court has held that such clauses are void as against public policy and unenforceable and that they act to void the entire contract. Zerkowsky v. Zerkowsky, 160 Miss. 278, 286,181 So. 647, 648 (1931) (client retained right to dismiss case even though attorney’s fee contract was contingent). In Cochran v. Henry, 107 Miss. 233, 244, 65 So. 213, 216 (1914), the court held that the entire contingent-fee contract was invalidated. The court ruled “the weight of authority [is] that a contract between attorney and client, whereby the client binds himself not to compromise or settle a pending or prospective lawsuit, is unenforceable.” Id.
¶ 85. When he considered the motion for summary judgment, the chancellor dodged this issue when he ruled that the invalid clauses could be severed and held the fee provisions were still enforceable. We do not see the authority to support this conclusion. In Cochran, the court determined that the “contract” was void as against public policy. In Whittington v. H.T. Cottam Co., 158 Miss. 847, 860, 130 So. 745, 749 (1930) (citations omitted), the *1208 court held that “[c]ontracts in violation of public policy are not voidable, but absolutely void, and the courts will refuse aid to either of the parties.”
¶ 86. Further, there appears to be a genuine issue of a material fact in dispute over whether other conduct by St. Martin was false and misleading.
¶87. In October 1998, while Forbes was still in the intensive-care burn unit, Weathers was researching the issue of whether an attorney could be entitled to a quantum merit award if he does not have a signed contingent-fee contract. As of June 10, 1999, St. Martin and Weathers appear to have been concerned that their personal recovery would be limited to a quantum merit award. Thus, St. Martin sought to get Forbes’s signature on a contract. St. Martin was concerned because they were engaged in serious settlement negotiations, and St. Martin thought he would need to produce a signed contract to the chancellor for approval of the settlement. The lawyers would have known that a quantum merit award of fees could possibly be substantially less than an attorneys’ fees award of at least one-third of $5 million dollars, the settlement offer on the table.
¶ 88. This certainly created a conflict of interest between Forbes and St. Martin and Weathers. By asking Forbes to sign the contract, in and of itself, St. Martin asked Forbes to act to his detriment and to St. Martin’s substantial benefit. The facts reveal that St. Martin testified that he did not share the results of the October 1998 research with Forbes or advise Forbes that his attorneys’ fee bill could be reduced.
¶89. The facts also appear to be in dispute as to whether St. Martin advised Forbes in June 1999 that he could decide to pay his attorneys on an hourly basis and that the fees could be taken out of the recovery, if any. Forbes testified that had he been properly advised, he would not have signed the June 10, 1999 contract. St. Martin, to support his motion, offered no evidence that he had acted in good faith with the utmost honesty, that the client had full knowledge and deliberation of his actions and the consequences of his actions, and that there was competent independent advice from someone other than St. Martin, or that the independent advisor was acting solely for the protection of Forbes. See Lowrey v. Will of Smith, 543 So.2d 1155,1161 (Miss.1989).
¶ 90. There is also a factual issue in dispute as to whether St. Martin should have advised Forbes on signing the contract. Forbes was entitled to independent advice. “ ‘[Independent’ advice in this sense means advice separate and apart from the beneficiary, both in the initiation and execution of the instrument.” Murray v. Laird, 446 So.2d 575, 579 (Miss. 1984) (modified on other grounds by Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987)).[5] Here, the facts indicate that there was no independent advice at all given to Forbes and that the advice given, i.e., that it would be more expensive to represent him on an hourly basis, was wrong. St. Martin admits he simply handed the con *1209 tract to Forbes and had him execute it. St. Martin apparently did not even read it himself. Simply handing a client an important legal document that has potentially adverse consequences to the client, and letting him fend for himself and blindly fumble along to the conclusion to sign the document, is not the type of independent advice this Court has advised attorneys to give. “The advisor has to be more than a mere scrivener; he has to render meaningful independent counsel.” Id. (citation omitted).
¶ 91. Lawyers are required to be above reproach and reach beyond the standards to which others would be held in normal commercial dealings. In Gwin v. Fountain, 159 Miss. 619, 645, 126 So. 18, 22 (1930), the supreme court held:
The relation of attorney and client is one of special trust and confidence. The law requires that all dealings between them shall be characterized by the utmost fairness and good faith on the part of the attorney. So strict is this rule that dealings between an attorney and his client are held as against the attorney to be prima facie fraudulent, and the attorney, in order to sustain ... a transaction ... advantageous to him, has the burden of showing, not only that he used no undue influence, but that he gave his client all the information and advice which it would have been his duty to give if he, himself, had not been interested.... The situation of an attorney with reference to his client puts it in his power to avail himself, not only of the necessities of his client, but of his liberality and credulity. The law ... often goes further, and holds such transactions void which between other persons would be held valid. It is a well-settled equitable principle that any one acting in a fiduciary capacity shall not make use of that relation to benefit his own personal interests, “except with the full knowledge and consent of the other person .... All transactions between parties in this relation are presumptively fraudulent and void.”
¶ 92. The apparently invalid provisions of the contingency-fee agreement may or may not render the entire contingency-fee agreement void. However, this is sufficient to determine that there are genuine issues of material fact in dispute, and St. Martin and the St. Martin firm are not entitled to a judgment as a matter of law.
CONCLUSION
¶ 93. Here, the Forbeses have presented sufficient evidence to establish that there is a genuine issue of a material fact in dispute, and we have determined that St. Martin and the St. Martin firm are not entitled to a judgment as a matter of law. For these reasons, we reverse the chancellor’s grant of summary judgment and remand this case for further proceedings.
¶ 94. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEES.
ISHEE, ROBERTS, CARLTON AND FAIR, JJ., CONCUR. BARNES, J., CONCURS IN PART AND THE IN RESULT WITHOUT SEPARATE WRITTEN OPINION. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY ROBERTS, J. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J. JAMES, J., NOT PARTICIPATING.

. There appears to have been no improper action by St. Martin in his effort to obtain this case. St. Martin testified that Lisa's aunt contacted him about Forbes’s accident and asked that St. Martin visit Forbes in the hospital. Lisa testified that she knew her aunt had contacted St. Martin and that she was expecting St. Martin at the hospital. Thus, there appears to be a genuine issue of a material fact in dispute as to whether St. Martin improperly solicited Forbes.

. House Bill 1574, filed in this session of the Mississippi Legislature, would amend these statutes and prevent conduct similar to the conduct alleged here. See http://billstatus.ls. state.m s.us/documents/2013/pdf/HB/l 500-1599/HB 1574PS.pdf.

. We note that M.R.A.P. 46 has been amended since In re Williamson was handed down; however, the court's analysis of this issue was not impacted.

. This fact alone indicates a conflict of interest between St. Martin and the Forbeses.

. Murray set forth a three-prong test to rebut the presumption of undue influence. Murray, 446 So.2d at 578. The third prong of that test was proof of advice of a competent person, disconnected from the grantee and devoted wholly to the grantor/testator’s interest. Id. Mullins modified the third prong and said that instead of independent advice independent consent and action is required. Mullins, 515 So.2d at 1193. Independent advice is one way independent consent and action may be shown, and the factors listed in Murray in the discussion of the independent adviser’s role may be considered. Mullins, 515 So.2d at 1193.